Memorandum 

THIRD DIVISION

April 23, 2003

No. 1-01-0758

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. ) 

)

RAUL CHAVEZ, ) Honorable

) Ralph Reyna,

Defendant-Appellant. ) Judge Presiding.

JUSTICE WOLFSON delivered the opinion of the court:

On November 10, 1998, at about 9:00 p.m., a car pulled up next to where Francisco Rodriguez and John Sparks were walking.  A man in the car asked them: “Who’s got the weed?” When the two men stopped and looked toward the car, the man who asked the question fired a gun at them four or five times.  Rodriguez was struck in the head, fatally.

Defendant Raul Chavez was arrested three days later.  He was tried before a jury for the first degree murder of Rodriguez.  He was found guilty of that charge and sentenced to 45 years in prison.  

Chavez raises several issues in this appeal, but we focus only on one of them: his claim that he was denied the opportunity to question the bias and motive of a police officer who testified to an oral statement made by Chavez.  Because we find Chavez’s constitutionally protected right of cross-examination was violated in this case, we reverse Chavez’s conviction and remand this cause for a new trial.

FACTS

SUPPRESSION HEARING

Chavez filed a motion to suppress the physical evidence recovered during a search of his car.  He filed a separate motion to quash his arrest and suppress a photo album recovered by police officers when they searched the room in which he was arrested.  The trial court held a hearing on both motions.  Detective Wojcik of the Chicago Police Department was the only person who testified during the hearing.  

Wojcik was assigned to investigate the murder of Francisco Rodriguez.  Between the time of the shooting and the time of Chavez's arrest, Wojcik interviewed approximately 15 people; five were eyewitnesses.  Several witnesses identified Chavez as the shooter.  

On November 13, 1998, at about 4:45 p.m., Gang Crimes Specialist Joseph Merinowski told Wojcik that Chavez was at 2939 North Monitor Street, his sister's house.  Chavez was preparing to flee to Mexico.  Wojcik headed right over and arrived at the address within 15 to 20 minutes.  

When Wojcik arrived, he saw a Ford Explorer matching the description of the car witnesses had said belonged to Chavez.  Wojcik "ran" the plates on the Explorer and learned it was registered to an address Chavez had used as his residence.  The Explorer was fitted with hand controls so that a person in a wheelchair could drive the car.

Wojcik went to the front of the residence and knocked on the door.   A boy, approximately 10 years old, answered.  Wojcik said "Police" and asked if Chavez was there.  The boy stepped back, opened the door, and said Chavez was in the back.  Wojcik and other officers entered the home and found Chavez seated in his wheelchair, two girls in the room.  Wojcik told Chavez he was under arrest.  

Chavez said the room was not his and the house was not his; the house belonged to his sister.  When asked, Chavez admitted he had been sleeping in that room while staying at his sister's house.  No one said anything to Wojcik about not wanting the police in the house.

After Wojcik told Chavez he was under arrest and advised him of his rights, Wojcik also asked Chavez if the officers could look around the room.  Chavez responded he did not mind.  Wojcik recovered a photo album that was on the dresser of the bedroom, which was about four or five feet from where Chavez was seated.  The photo album contained what Wojcik referred to as "gang photographs."  

Officers were posted to watch Chavez's car.  A tow of the car was ordered.  

Chavez was taken to the police station.  Police officers interviewed him briefly, then asked him whether police could search his car.  Chavez consented and signed a consent-to-search form.  

At about 8:00 p.m., after Chavez signed the consent, Wojcik returned to the house and searched Chavez's car.  It had not yet been towed.  Wojcik testified he took items out of the car but did not describe these items.  Wojcik did not have a warrant for the search or seizure of the car, for the search of the room, or for Chavez's arrest. 

Chavez stipulated that the police had probable cause to arrest him.  

At the conclusion of the hearing, the court disagreed with Chavez's position that the car had been seized the moment the officers were posted to guard it and the tow was ordered.  The court found Chavez gave consent to search the vehicle.  With respect to the entry into the home, the court found Chavez gave the officers consent to enter the room and to look around the room.  The court then denied both motions to suppress.   

TRIAL

Nicole Rafael and Athena Pagan testified for the State, giving similar accounts of the shooting.  On the evening of November 10, 1998, Pagan and Rafael were at a wake for Shorty, a member of the Latin Eagles gang.  At the time, Pagan was dating Cesar Diaz, also a member of the Latin Eagles.  

Nicole Figueroa, Julio Rivera, Victor Orta, and Chavez were present at the wake.  Rivera, Orta, and Chavez were members of the Latin Eagles.  Figueroa was dating Rivera at the time.  

At some point that evening, Rivera picked up Chavez, who had been in Orta's car, and placed him in Rafael's car, a two-door, bluish-green, 1992 Chevy Cavalier.  Chavez sat in the front passenger seat, and Rafael sat in the back seat.  Chavez was wearing a "hoodie" at the time.  Orta drove the car.  Rivera, Diaz, Figueroa, and Pagan followed in Diaz's dark blue Jeep Cherokee.  Rivera drove. 

The Cavalier and the Cherokee drove down side streets.  After they passed a group of guys, Orta pulled over, and Rivera pulled up on Chavez's side.  Chavez wanted to go around the block to see who the guys were.

They drove around the block with the Cherokee still following the Cavalier.  The group was gone, but they pulled up next to two men walking near the middle of the block on the sidewalk.  Pagan heard Chavez yell something at them.  Rafael heard Chavez ask, "Who's got the weed?"  Then Chavez fired several shots at the men.

One of the two was struck and fell to the ground.  The other ducked.  The Cavalier and the Cherokee drove away from the scene of the shooting.

John Sparks testified he is a member of the Maniac Latin Disciples.  Rodriguez was a friend of Sparks.  At about 9:00 p.m. on November 10, 1998, Sparks and Rodriguez were walking on Albany between Diversey and George.   

A teal-like green Pontiac pulled up, and a man in the passenger seat asked the two men for some weed.  Sparks was standing closer to the car, and Rodriguez was side-by-side with Sparks.  

The man in the car fired about three shots before Sparks could move.  Sparks hit the ground, and the man took about four more shots.  The car then took off.  Sparks did not see where the car went.  Other than the shooter and the driver, Sparks could not see anyone else in the car.

Sparks described the shooter as Hispanic, 18-20 years old with a wide nose and little facial hair.  He was wearing a hoodie.  Sparks was unable to identify Chavez as the shooter in court.

Several days after the shooting, Sparks viewed a lineup and identified a person in the lineup as the shooter.  Sparks was shown a photograph of the lineup and circled the person in the picture that he identified as the shooter.  The person in the photograph had a shaved head.  It was Chavez.

Detective Daniel Engel testified that on November 13, 1998, at about 5:15 p.m., the police arrested Chavez at 2939 North Monitor and transported him to the police station.  Once there, the police questioned him.

Chavez signed a consent-to-search form for his car, a 1991 Ford Explorer at 7:50 p.m.  Engel, along with his partner, personally searched the car. 

At about 8:00 p.m., Chavez was in a lineup at the police station.  He also was photographed.  Engel viewed the same lineup photograph Sparks did during his testimony.  Engel said the person circled in the photograph was Chavez.

Engel identified a Latin Eagles card with "Sir Ringo" on it and a black, hooded sweatshirt, which were recovered from the car.  Engel also identified a photograph of members of the Latin Eagles with Chavez in the center.  The people in the picture were representing the gang with gang signs.  This photograph was also recovered from the car.  Engel identified another picture of Chavez and another member of the Latin Eagles making the gang sign of the Latin Eagles with their hands.  

Engel identified a cigar with writing on the wrapper that said "Latin Eagles."  Underneath Latin Eagles was written "MLDK," which Engel, without objection, said stood for Maniac Latin Disciples Killer.  There also was a gang sign of the MLD, which is a pitchfork.  The pitchfork was upside down.  Engel said that signified disrespect to the MLD.  Below that the wrapper said "Shorty R-I-P."  The cigar was recovered from Chavez's car.  

Engel also identified several photographs of Chavez, showing his various tattoos, which appeared to be gang-related.  One of the tattoos said "Prince Ringo." 

The parties stipulated that if Dr. Barry Lifschultz, Deputy Medical Examiner, were called to testify, he would say Francisco Rodriguez died as a result of a gunshot wound to the head.

Chavez testified he has been in a wheelchair for five years and was a member of the Latin Eagles.  Chavez said he was not a "prince" in the Latin Eagles and that "Prince Ringo" was simply his nickname.  

On November 10, 1998, Chavez went to a wake for his friend, Jose Campo, also known by the nickname Shorty and a member of the Latin Eagles.  Chavez saw Rivera and Orta at the wake.  He did not see Figueroa, Pagan, or Rafael at the wake although he remembered Rivera saying he was there with his girlfriend.  About 75 people were at the wake.  Everyone at the wake, except for Shorty's family and some girls, was a member of the Latin Eagles.  The people at the wake were sad and grieving, but there were no discussions between the Latin Eagles.

A little before 8:00 p.m., Chavez had an "accident" while attempting to use the bathroom.  After the accident, Chavez drove himself home.

Chavez said that at no time that day was he on the 2800 block of North Albany, in Rafael's car, or around a Jeep Cherokee.  He has never been in Rafael's car.  He had nothing to do with the shooting of Francisco Rodriguez.

When Chavez was arrested, he told police he did not want to speak to anyone unless his lawyer was present.  Chavez denied making any statement to the police other than to say he was not going to talk.  

Chavez said that on November 10, 1998, he was bald, had a little facial hair, and wore contacts.  After his arrest, he let his hair grow.  At trial, Chavez was wearing glasses. 

On rebuttal, the State recalled Engel.  Engel testified that after Chavez was arrested, Engel spoke with him at the police station.  Chavez made his first statement when he was initially taken to the station by special transport, around 7:00 p.m.  At that time, the police informed Chavez of his rights, obtained Chavez's full name and address, and explained to Chavez why he had been arrested.  Chavez denied knowing anything about the shooting.  In his second statement, Chavez also denied knowing anything about the shooting.  The third time police spoke with Chavez, at about 9:00 p.m., Chavez made some statements.  

Chavez told Engel he was in a car with Dizzy and Gordy on the night of November 10, 1998.  Dizzy was a rear passenger, and Chavez was in the front passenger seat.  Chavez said the car was driving north on Albany from Diversey when he saw two individuals on the sidewalk to his right.  Gordy reduced the speed of the car.  Chavez rolled down the window and asked the two individuals if they had any weed.  

After Chavez made his oral statement, he said he no longer wanted to talk without his lawyer.  The police respected that request and did not force him to give a written statement. 

At the close of the trial, the jury returned a verdict of guilty against Chavez for first degree murder.  

DECISION 

I.  CONFRONTATION OF WITNESSES

Chavez makes several claims that he was denied his constitutional right to confront witnesses due to the trial judge’s restrictions on cross-examination of State witnesses.  We agree with one of them.

Through direct examination of Chavez and cross-examination of Engel, defense counsel sought to establish bias and motive in order to explain why the officer would fabricate Chavez’s purported oral statement.  

The oral statement, if believed by the jury, put the lie to Chavez’s testimony and devastated his defense.  The statement put Chavez at the scene of the killing, something he denied at trial, and corroborated the testimony of the State’s eyewitnesses.  Chavez’s theory at trial was that he was being framed by the State’s witnesses for various reasons.  It was not much of a theory, but he had the right to present it for what it was worth.  Failure to explain why Engel would concoct the oral statement left Chavez with no theory at all.

Defense counsel made an offer of proof: About five years earlier Chavez was shot in the back by Chicago police officers.  The shot caused Chavez’s paralysis.  A lawsuit against the police was pending at the time of trial.  At the time Chavez was being questioned by the Chicago police officers in this case, Engel said to Chavez: “You are not going to see a dime from your lawsuit, and the officer who shot you five years ago should have killed you when he had the chance.”  The trial judge instructed defense counsel not to pursue that line of questioning.  

The right to cross-examine a witness about his bias, prejudice, or ulterior motives is protected by the Federal and Illinois Constitutions.  U.S. Const., amend. VI, XIV; Ill. Const. 1970, art. I, sec. 8; 
People v. Gonzalez
, 104 Ill. 2d 332, 337, 472 N.E.2d 417 (1984).  “The exposure of a witness’ motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.”  
Davis v. Alaska
, 415 U.S. 308, 316-17, 94 S. Ct. 1105, 1110, 39 L. Ed. 2d 347, 354 (1974).  The widest latitude should be given the defense on cross-examination when trying to establish a witness’ bias or motive.  
People v. Wilkerson
, 87 Ill. 2d 151, 156, 429 N.E.2d 526 (1981).

In this case, Engel’s alleged comments about the pending lawsuit and the officer’s errant aim five years earlier, if believed by the jury, could have established a bias or motive that would explain why Engel would manufacture an oral statement by Chavez.  We do not know what Engel would have said had he been asked about his purported statement to Chavez.  We do know Chavez stood ready to testify he said it.

The right to impeach a witness with evidence that tends to establish bias or motive is well-established in this State.  
Gonzalez
, 104 Ill. 2d at 337 (reversible error to bar cross-examination of the State’s chief witness on the subject of gang membership); 
People v. Furby
, 228 Ill. App. 3d 1, 591 N.E.2d 533 (1992) (reversible error to bar questions directed at police officer’s dislike of unsolved crimes and his duty to obtain confessions, where defense claimed officer falsified an alleged statement by the defendant); 
People v. Gordon
, 128 Ill. App. 3d 92, 470 N.E.2d 29 (1984) (reversible error to bar questions of officer aimed at showing another person at the place where drugs were found was not charged with drug possession after the officer talked to that person’s mother, who was a police officer); 
People v. Betts
, 116 Ill. App. 3d 551, 451 N.E.2d 1028 (1983) (reversible error to bar questions of two State witnesses concerning their expectations of leniency).

We conclude that defense counsel in this case should have been allowed to ask Engel about his purported words to Chavez at the time the alleged oral statement was elicited.  Refusal to allow those questions for the purpose of establishing bias or motive was error of constitutional dimension.  We see no hearsay barrier to the questions, a claim the State raises for the first time on appeal.

Ordinarily, we would next determine whether the constitutional error was harmless beyond a reasonable doubt.  
Betts
, 116 Ill. App. 3d at 556; see also 
Chapman v. California
, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705, 710-11 (1967).  The inquiry would entail an examination of the evidence to decide whether it overwhelmingly supports the verdict.  
Furby
, 228 Ill. App. 3d at 6.  However, we find a procedural barrier to conducting a harmless error analysis in this case.  

Our supreme court has held the burden is on the State to establish beyond a reasonable doubt that constitutional infringement of a defendant’s right of confrontation did not contribute to the outcome of the case.  
People v. Lofton
, 194 Ill. 2d 40, 61, 740 N.E.2d 782 (2000); 
People v. McClanahan
, 191 Ill. 2d 127, 139, 729 N.E.2d 470 (2000).  In 
Lofton
 and 
McClanahan
, the State confined its arguments to asserting there were no constitutional violations.   In neither case did the State argue the error was harmless.  Both decisions held the failure to make the harmless error argument was a failure of the State to satisfy its burden of showing beyond a reasonable doubt that the error did not contribute to the guilty verdict.  
Lofton
, 194 Ill. 2d at 61-62; 
McClanahan
, 191 Ill. 2d at 139-40.  In neither 
Lofton
 nor 
McClanahan
 did the supreme court undertake any independent investigation of the strength of the State’s evidence.

We conclude the trial court’s restriction of the cross-examination in this case warrants reversal and remand for a new trial.  Because some of Chavez’s other contentions may arise again on retrial, we address them.

II.   MOTIONS TO SUPPRESS

Chavez attacked the search of the bedroom he was in and of his Ford Explorer.  We see no need to inquire into the bedroom search since nothing found there was used at trial.  In short, there was nothing to suppress.

Chavez makes no serious claim that his written consent to search the Ford Explorer was unlawfully obtained.  Certainly, there was no evidence presented at the hearing on the motions to suppress that would support such a claim.  He does say the car was unlawfully seized before he signed the consent.

Before the consent to search was signed, a uniformed officer was assigned to watch the car and a tow was requested.  There was no attempt to enter the car or to stop anybody else from entering it.  The consent was signed before any towing took place.  The car was parked on the street.  We do not find any “meaningful interference” with Chavez’s possessory interest in the car before the consent was signed.  
United States v. Jacobsen
, 466 U.S. 109, 113, 104 S. Ct. 1652, 1656, 80 L. Ed. 2d 85, 94 (1984).  The trial court did not err when it denied the motions to suppress.

III.   EXPERT TESTIMONY

Chavez contends the trial court erred when it allowed Engel to testify to the meaning of “MLDK” without being qualified as an expert and without foundation  testimony about who wrote those letters on the cigar found in Chavez’s car.

The State correctly contends the issues were forfeited for review because no timely objection was made.  However, they could come up again on retrial.  We make two observations for the trial court’s guidance.  First, some foundation must be established to support Engel’s interpretation of the letters, either as an expert (
People v. Davis
, 335 Ill. App. 3d 1, 779 N.E.2d 443 (2002)); or as a nonexpert after a showing he is basing his conclusion on his personal knowledge, on concrete facts perceived from his own senses and not on the statements of others.  M. Graham, Cleary & Graham’s Handbook of Illinois Evidence, § 701.1 (7
th
 ed. 1999).  Second, since the cigar was seized from Chavez’s car, no evidence concerning who actually wrote “MLDK” is required.

The cigar was evidence of a motive for the shooting.  It had been distributed at Shorty’s wake.  Given the proper foundation, it should be admissible evidence.

CONCLUSION

For the reasons we have stated, Chavez’s conviction is reversed.  Because we find there is ample evidence to support a guilty verdict, double jeopardy considerations do not prevent a retrial.  
People v. Olivera
, 164 Ill. 2d 382, 393, 647 N.E.2d 926 (1995).  Therefore, the case is remanded for a new trial. 

Reversed and remanded. 

HOFFMAN, and HALL, JJ., concur.