# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Williams*, 2011 IL App (1st) 093350

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MAURICE WILLIAMS, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-09-3350 |
| Filed | December 30, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a prosecution for aggravated unlawful use of a weapon, the trial court did not violate defendant's constitutional right to confront the witnesses against him by denying his motion *in limine* to introduce evidence of a prior, unrelated shooting involving the same detectives involved in defendant's case and the appellate court rejected defendant's contention that the aggravated unlawful use of a weapon statute violated the constitutional guarantee of the right to keep a firearm for self-defense. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-14791; the Hon. Timothy Joyce, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Peter Sgro, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Veronica Calderon Malavia, and Kathryn A. Schierl, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justice Garcia concurred in the judgment and opinion.
Presiding Justice R. Gordon dissented, with opinion.

**OPINION**

¶ 1     Following a jury trial defendant, Maurice Williams, was convicted of one count of aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2006)). Defendant was sentenced to 30 months' probation and 5 months in the Cook County department of corrections, time served.

¶ 2     On appeal defendant contends that (1) the trial court violated his right to confront witnesses against him when the court did not allow him to question the detectives who shot him during his arrest about a prior incident where the same detectives shot and killed a fleeing suspect and the City of Chicago settled out of court with the estate of the deceased; and (2) the statute creating the offense of aggravated unlawful use of a weapon violates the individual right to bear arms. For the reasons that follow, we affirm.

¶ 3                         BACKGROUND

¶ 4     Defendant was arrested and charged with two counts of aggravated assault, for allegedly pointing a rifle and a handgun at Detectives Brian Forberg and Kevin Eberle, and with aggravated unlawful use of a weapon based on allegations that he was carrying uncased, loaded and immediately accessible firearms in public.

¶ 5     Prior to trial defendant filed a motion *in limine* seeking to admit evidence of an unrelated civil lawsuit that had been settled out of court involving Detectives Forberg and Eberle. The lawsuit involved an allegation of an unjustified shooting of a fleeing suspect. In defendant's motion, he claimed that he was unarmed and that the detectives falsely accused him of pointing a gun at them to justify the fact that they shot defendant. Defendant sought to admit this evidence to demonstrate the officers' "*modus operandi* of falsifying evidence to justify the shooting of an unarmed civilian who was fleeing, " to show the officers' intent, and to rebut their self-defense claim. The trial court denied the motion, ruling that the evidence (1) was not relevant to any issue in the case and was not "*modus operandi*," (2) would unfairly

prejudice the State, and (3) was "collateral and distracting" to the question of defendant's guilt. Defendant's motion to reconsider raising the same arguments, as well as an additional claim that the prior shooting could affect the detectives' credibility, was denied by the trial court. On appeal, defendant has abandoned the claim that the evidence was relevant to *modus operandi* and self-defense, arguing that the unrelated shooting was admissible as it went to the detectives' credibility, bias and motive to testify falsely.

¶ 6     At trial, Phillip Willis was called as a witness for the State. He testified that on May 20, 2006, his nephew was murdered and the police were investigating the homicide. On May 22, 2006, Willis contacted Detectives Eberle and Forberg and told them that he heard that the killer, nicknamed Pig, lived near 68th and Calumet Avenue and was in the area.

¶ 7     Detectives Forberg and Eberle picked Willis up from his home in an unmarked car and they drove to 68th and Calumet. They saw Pig's car traveling on Calumet and pursued him. Three people were in the car, including Pig. Pig turned and slowed down as if he was going to stop, but then drove off. Pig did this two or three times, after which a man jumped out of the car from the backseat and fled. Although Willis could not see the man's face, he did notice that he was holding a sack in his hand as he ran. The man crouched as he ran and something was under his arm sticking up out of a bag that could have been a rifle. The man ran on the sidewalk past the police car toward Calumet and turned the corner. Willis remained near the police car on the block and heard gunshots once the detectives turned the corner. Once the man jumped out of the car, Pig waited a few seconds and drove off. Willis did not see anyone throw anything out of Pig's car or anyone else exit Pig's car.

¶ 8     On May 23, 2006, at approximately 5:50 a.m., Willis went to the police station where he spoke with detectives and Assistant State's Attorney (ASA) Planey. At trial, Willis did not remember talking to ASA Planey, but he identified a handwritten statement which he acknowledged he signed on May 23, 2006. Willis also said that at the time he signed the statement he told ASA Planey the truth. In his statement to ASA Planey, Willis told her that (1) the man had a rifle in his hand; (2) the police told him to stop and identified themselves; (3) the man with the rifle ran and the police chased him; and (4) he saw the man turn toward the detectives with the rifle and other weapons in his hand.

¶ 9     On cross-examination, Willis testified that he did not see the man who exited the car point a rifle or a handgun at the detectives and that he did not see the man turn around. He also admitted to talking to Detective Nolan on May 22, 2006, at the station but claimed not to remember telling Detective Nolan that he ran down Prairie after the detectives or that he saw the offender lean to the left and fire a gun. Willis testified that he did not see any fire coming from the offender's gun. Willis said that he saw the offender run north on Prairie toward 69th Street and that he did not see the offender drop the bundle he was carrying. Detective Nolan testified that Willis told him that he saw the offender fire a weapon.

¶ 10    ASA Planey testified that on May 23, 2006, she was assigned to this investigation. She went to the police station where she spoke with Willis in the presence of Detective Richter for 20 to 30 minutes. She memorialized in writing Willis's oral statement, which was admitted into evidence. She testified that Willis told her that as the man ran by, he noticed that the man had a rifle in his hand; that both detectives jumped out of the police car and

yelled, "Halt, Police"; that the man with the rifle was also carrying a bundle of weapons in his sweatshirt; that he saw the man with the rifle turn toward the detectives while he was still holding the rifle and the other guns; and that he heard the detectives yell "police, police" and then heard a shot.

¶ 11 Detectives Forberg and Eberle both testified, in summary, as follows. They picked up Willis to look for the suspect in his nephew's murder. At Willis' direction, they went to the area of 68th and Calumet, where Pig's grandmother lived. When driving on Calumet, they saw Pig's red Dodge Stratus. After the Dodge turned west onto 70th Street, they activated their lights in an attempt to curb the vehicle. The car made several turns toward the curb as if to stop; however, each time the car pulled back into the street and continued driving. Defendant jumped out of the car carrying a rifle and the two detectives exited their car. Defendant ran toward them pointing a rifle in their direction. Detective Eberle told defendant to stop and drop the weapon, but he did not comply. Detectives Eberle and Forberg then fired in defendant's direction. As defendant ran, he fell down and dropped the rifle, got up and ran. As defendant approached the intersection of Prairie and 70th Street, defendant pointed a dark-colored handgun at them. Both detectives again fired at defendant. Defendant then ran north on Prairie, and Detective Forberg fired a shot at defendant after defendant again pointed the handgun at them. Defendant fell again, got up and continued running.

¶ 12 After defendant turned east onto 69th Place, the detectives lost sight of him briefly, and Detective Forberg then saw defendant run into an alley. Detective Forberg approached the alley and saw defendant jump out and point a handgun at him. Detective Forberg fired and defendant jumped back out of sight. Other units came to the scene and searched, but could not find defendant. Eventually Detective Forberg heard a dispatch that someone had called 911 and told them the suspect was hiding in a garbage can. Detective Forberg saw police apprehend defendant and take him into custody. Detective Forberg identified defendant. When Detective Forberg arrived back at his squad car, he saw a rifle and two handguns.

¶ 13 The parties stipulated that Detective Jennifer Flower would testify that on May 23, 2006, she and 38 other officers and a canine unit took part in the investigation of the May 23, 2006, incident. The handgun defendant allegedly had in the alley was never recovered. Other evidence introduced through various witnesses called by the State included testimony that a fired cartridge case was located at 70th Street and Prairie Avenue, three fired cartridge cases were located at 244 East 70th, two cartridge cases were located across the street at about 223 East 70th, a metal fragment was located at about 242 East 70th, a copper jacket was located in the rear yard at 6923 South Prairie, and at 244 East 70th on the sidewalk, a rifle, a Colt .38 handgun partially inside a Crown Royal bag, a .357 Magnum handgun, a plastic banana-shaped magazine and a piece of the wooden handle of the .38 were recovered. In the street at 308 East 69th Street, police recovered a long-sleeved white sweatshirt with blood on it, and at 314 East 69th Place, they recovered another fired cartridge case. The banana clip contained 22 live rounds and the 2 handguns each contained 6 live rounds. All the recovered weapons were in firing condition. The weapons were examined; however, no latent prints were found on them.

¶ 14 ASA Peter Garbis testified that on May 23, 2006, he was assigned to the felony review unit of the Cook County State's Attorney's office. At 5 p.m. he went to Christ Hospital to

-4-

interview defendant. He spoke to defendant at 7:20 p.m. Defendant had undergone surgery and was on pain medication. ASA Garbis gave defendant his *Miranda* warnings and defendant agreed to speak to him. Defendant told him that on the previous day, defendant's friends, Face and Pig, picked defendant up in Face's red car. Defendant was in the backseat and there were two guns in the rear seat. As they drove, Face stopped and picked up a rifle. When the police car pulled up behind them and turned on its lights, defendant was frightened so he jumped out of the car with the weapons and the police shot at him. Defendant threw the guns on the ground and ran because he was scared. Defendant said he was shot while running from the detectives and that he hid in a garbage can. Defendant denied ever shooting at anyone. ASA Garbis said defendant was lucid during the conversation and defendant's speech was clear.

¶ 15 Defendant presented the testimony of Officer Ford to perfect impeachment. Officer Ford said he drafted a general offense case report and that the report stated that Detective Forberg said defendant dropped the weapon but did not mention that defendant fell or that it was a rifle.

¶ 16 Detective Kelley was also called by defendant. Detective Kelley testified that he wrote a detective supplemental report. Detective Kelley recalled that Detective Forberg told him that the suspect fell down, but he did not recall him saying that he dropped a rifle.

¶ 17 Trauma nurse Thomas Giusto testified that when he came on duty at 3 p.m., on May 23, 2006, defendant was his patient. On May 23, 2006, after surgery to repair damage caused to his colon from a gunshot wound to his left flank, defendant was taken to a room in the trauma unit at approximately 3 p.m. Defendant had a patient-controlled analgesia for morphine, which is a pump that the patient uses to administer pain medication to himself. Between Giusto's eight-hour shift from 3 p.m. to 11 p.m., defendant used 33.2 milligrams of morphine.

¶ 18 On cross-examination, Giusto testified that based on defendant's trauma flow chart, defendant had two gunshot wounds, one on the left lower abdomen and one on the left lower back located in the flank, possibly a through-and-through gunshot wound. Defendant did not have a gunshot wound in the middle of his lower back. Defendant's physical therapy form indicated that defendant was shot in his right upper extremity and in his abdomen. Giusto also testified that at approximately 9 p.m. on May 23, 2006, he and defendant signed a consent-for-operation form after being informed of what the surgery was and all of the risks associated with the surgery. Either Giusto or a doctor would have made sure defendant understood what this consent form meant and defendant would have been in a condition to sign the consent form.

¶ 19 Defendant testified that after he got off a bus at 95th Street and State Street he stopped at McDonald's, got a burger and began to walk home. Pig (Ahmad Hicks) offered him a ride home. Defendant got in the rear seat, which was full of garbage. An unknown male was seated in the front passenger seat. Pig introduced the passenger as Face. Defendant did not see any weapons in the car at that time. As Pig turned from 69th Street onto southbound Calumet, defendant noticed an unmarked police car following them with its lights on. Defendant told Pig to pull over because the police were behind him when they were near

70th Street. Pig started to slow down as if he was going to stop, but due to construction on Calumet he could not stop. Pig turned west onto 70th Street, but did not pull over, and Pig and Face were leaning forward doing something. Defendant was still telling Pig to pull over when Pig tossed a black handgun toward the back of the car where defendant was sitting. Defendant jumped out the car as soon as he saw the gun, even though the car was still moving slowly. Defendant did not have anything in his hands and he never held or ran with a rifle or a banana clip.

¶ 20    Defendant testified that he ran east toward Prairie and saw the police still coming across the intersection. Defendant turned north on Prairie and kept running. As he got to the corner he heard gunshots and thought that the police were shooting at Pig and Face because they had a gun. Defendant kept running north on Prairie until he realized they were shooting at him. He never turned back to see who was shooting. Defendant ran faster, crossed into the middle of the street, and fell because he got shot in the small of his back. Defendant kept running, but he never had a weapon and did not point a weapon at the officers. Defendant turned east at the corner of 69th Place and got shot in the back of his right arm. Defendant turned north down an alley off of 69th Place and he got shot in his side. As soon as he got into the alley defendant dove into a garbage can because he was afraid of being killed. Police came, flipped the can over, grabbed defendant when he fell out and cuffed him. Defendant passed out from the pain in his right arm when the police grabbed him. The next thing defendant remembered was waking up in the hospital. Defendant did not recall speaking to ASA Garbis or Detective Kelley at the hospital.

¶ 21    On cross-examination, defendant testified that he was suing Detectives Forberg and Eberle for shooting him. He was positive they shot him three times, but the complaint in his lawsuit says he was only shot twice by them.

¶ 22    Defendant then presented the stipulated testimony of Detective Nolan, who would testify that on May 22, 2006, he spoke with Phillip Willis, who told him that he "saw offender turn at, near Prairie, lean to the left and fired. Don't know how many times." He would also testify that Willis told him that he "chased after the detectives down Prairie. Once he got to 69th Place, he stopped." Defendant then rested his case.

¶ 23    The jury found defendant guilty of aggravated unlawful use of a weapon with a rifle and not guilty of the other charges. Defendant was sentenced to 30 months' probation and 5 months in the Cook County department of corrections, time served.

¶ 24                            ANALYSIS
¶ 25            I. Violation of Right to Confront Witnesses Against Him
¶ 26    Defendant filed a motion *in limine* seeking to introduce evidence of an unrelated prior shooting involving Detectives Forberg and Eberle, which was settled out of court. After a hearing in which the court, the defendant and the State had access to the reports generated in the prior incident, the trial court denied the motion. The motion to reconsider was also heard and denied.

¶ 27    Defendant initially argued to the trial court that the evidence of the unrelated, civil lawsuit was relevant to show *modus operandi* and the intent of the detectives, and to rebut

the officers' claim of self-defense in support of defendant's theory that the officers falsely accused him of being armed to justify shooting him. Later, at a subsequent hearing on the motion to reconsider, defendant argued that the evidence was relevant to the detectives' credibility.

¶ 28    In arguing against the motion, the State represented, without contradiction by defense counsel, that the reports received on the unrelated case demonstrated that the two incidents occurred a year a part, in two distinct police districts, and that the unrelated incident involved a male Hispanic, who was shot in the face, chest and groin and not in the back. Additionally, the unrelated case involved three different reports of shootings, and on the third report of a shooting, officers and detectives heard the shots and received a flash message with a description of the offender. Officers DeFieco and Alonzo were the first to see the alleged offender, a Mr. Pudar, who matched the description given. According to the reports, Officer DeFieco got out of his car and approached Pudar. Pudar pulled a gun and fled. A chase ensued and Officer Kerr, who was not involved in defendant Williams' case, started chasing Pudar. Pudar turned around and pointed a gun at Officer Kerr. Kerr fired approximately 15 rounds and shot Pudar. Detectives Forberg and Eberle were following the chase and saw the shooting, and they fired also. The general progress reports identified two civilian witnesses who both said they saw Pudar running with a gun. Finally, the general offense case reports were written by Officers DeFieco and Alonzo; nothing was generated by Detective Forberg or Eberle.

¶ 29    After hearing arguments the trial court denied the motion, ruling that the evidence was other crimes evidence that was more prejudicial than probative and that it was irrelevant to prove any of the issues in the case or to make more likely than not the existence of any issues. The court also opined that the evidence was "collateral and distracting" to the question of whether or not the defendant was guilty. On the denial of the motion to reconsider, the court, in summary, explained further that the evidence was not admissible as "*Lynch*" type evidence and that the court believed it was propensity evidence because it did "nothing other than have the effect of permitting the jury to conclude that these are bad cops, therefore they shouldn't be believed generally." See *People v. Lynch*, 104 Ill. 2d 194 (1984). Finally, the court ruled that the evidence of a shooting a year prior to the case at issue did not go to the issue in this case of whether defendant had a gun and whether he pointed it at the officers.

¶ 30    Abandoning the claim that the evidence was relevant to *modus operandi* and to the issue of self-defense, on appeal defendant pursues the claim that the unrelated shooting was admissible as it went to the detectives' credibility, bias and motive to testify falsely.

¶ 31    Defendant argues that the trial court mistakenly held that the prior incident constituted inadmissible propensity evidence. Defendant contends that the "prior incident was probative of the detectives' bias and motive to testify falsely because the detectives would be extremely wary of having an unjustified shooting on their record after a previous shooting had resulted in a settlement." Defendant claims the trial court's ruling denied him his right to confront witnesses against him and that this court should reverse his conviction and remand the cause for a new trial.

¶ 32    A ruling on a motion *in limine* is a matter within the discretion of the trial court and will not be reversed absent an abuse of that discretion. *People v. Nelson*, 235 Ill. 2d 386, 420 (2009). An abuse of discretion occurs only when the trial court's ruling is "arbitrary, fanciful, or unreasonable or where no reasonable man would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Santos*, 211 Ill. 2d 395, 401 (2004).

¶ 33    A defendant has a fundamental constitutional right to confront the witnesses against him, which includes the right of cross-examination of witnesses to inquire into their bias, interest, or motive to testify falsely. *Nelson*, 235 Ill. 2d at 420-21. However, the evidence offered to impeach must raise an inference that the witness has something to gain or lose by his testimony; the evidence must not be remote or uncertain. *People v. Coleman*, 206 Ill. 2d 261, 278 (2002); *Nelson*, 235 Ill. 2d at 421. Moreover, a witness may not be impeached on collateral or irrelevant matters. See *Santos*, 211 Ill. 2d at 407.

¶ 34    "Cross-examination to show interest, bias or motive on the part of a witness is a matter of right, subject only to the broad discretion of the trial court to preclude repetitive or unduly harassing interrogation and, *assuming a proper subject matter*, to control the extent of cross-examination." (Internal quotation marks omitted.) (Emphasis in original.) *People v. Green*, 339 Ill. App. 3d 443, 455 (2003). Cross-examination is a right protected by both the federal and state constitutions. *Id.* The interest is satisfied when counsel is permitted to expose the jury to facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. *Id*. It is important to note that the constitutional requirement must be satisfied first and only then does the court have discretion to limit the scope or extent of cross-examination. *Id.* The proposed cross-examination must relate to a proper subject matter. *Id.* However, the evidence of interest, bias or motive must be direct and positive, not remote and uncertain, because the evidence must potentially give rise to the inference that the witness has something to gain or lose by his testimony. *Id*; see also *People v. Sims*, 192 Ill. 2d 592, 625 (2000).

¶ 35    The record does not support defendant's claim that his constitutional rights were violated. The facts of the unrelated incident demonstrate that the incident happened one year prior to defendant's case, in a different district, with materially different allegations, involving many different officers, in addition to the two detectives involved in this case. In addition, two civilians said they saw the deceased with a weapon. These facts do not raise an inference that the detectives had "something to gain or lose by [their] testimony." *Coleman*, 206 Ill. 2d at 278. Furthermore, the allegation by defendant that the "prior incident was probative of the detectives' bias and motive to testify falsely because the detectives would be extremely wary of having an unjustified shooting on their record after a previous shooting had resulted in a settlement" is unsupported speculation that is remote and uncertain.

¶ 36    *Coleman* is instructive. In *Coleman*, the trial court refused to allow defendant to impeach an officer with two civil settlements obtained against the officer and/or the City of Chicago in defendant's postconviction petition, which alleged that the officer had participated in torture and with the fact that the officer had previously been suspended by the police department. *Coleman*, 206 Ill. 2d at 272-73. The defendant identified six incidents of alleged physical abuse of in- custody subjects and alleged that at least two judgments were obtained; one lawsuit alleged torture and falsification of police reports and the other lawsuit claimed

physical abuse. The defendant claimed that the evidence was admissible to show that the officer's *modus operandi* was to use whatever means necessary to convict his victims, including torture, suggestive lineups, false police reports and perjury.

¶ 37　　In affirming the trial court, the supreme court first recognized, as fundamental, a criminal defendant's right to confront the witnesses against him and the right to inquire into a witness's bias, interest, or motive to testify falsely; however, the court noted that the evidence used to impeach must give rise to an inference that the witness has something to gain or lose by his testimony. Therefore, the evidence must not be remote or uncertain. In *Coleman*, the court held that it was not error to prevent admission of evidence regarding the complaints and lawsuits because they were irrelevant as they did not provide any inference that the officer "had a motive to testify favorably to the State or to perjure himself in any manner." *Coleman*, 206 Ill. 2d at 282.

¶ 38　　In reaching its decision that the evidence of the complaints and the lawsuits was irrelevant, the court relied upon the reasoning in *People v. Davis*, 193 Ill. App. 3d 1001 (1990), and *People v. Cameron*, 189 Ill. App. 3d 998 (1989). In *Davis*, the officer kicked the defendant in the groin in what the officer said was an attempt to protect himself from the defendant, who was resisting the officer's attempt to arrest him. The defendant attempted to cross-examine the officer concerning one prior and one pending civil rights lawsuit alleging the officer had used excessive force in making an arrest. The circuit court sustained the State's objection to this questioning because the officer had not been disciplined in the settled suit and the pending suit was not related to the defendant's case. *Davis*, 193 Ill. App. 3d at 1003. On appeal, the court affirmed the trial court's ruling, noting that evidence showing bias or motive to testify falsely must be direct and positive, not remote or uncertain. The court observed that the officer had not been reprimanded or suspended regarding the allegations in either suit and that mere evidence of a civil suit against an officer charging some breach of duty unrelated to the defendant's case is not admissible to impeach the officer. *Davis*, 193 Ill. App. 3d at 1005.

¶ 39　　Similarly, in *Cameron*, the defendant attempted to use a pending suit against an officer to impeach the officer. In the pending suit, the plaintiff had accused the officer of misidentifying him as the person who had delivered a controlled substance to a confidential informant. The defendant contended the pending suit showed bias on the officer's part to gain favor from the State by testifying. *Cameron*, 189 Ill. App. 3d at 1002. The trial court granted the State's motion *in limine* to prohibit the defense from introducing this evidence. In affirming the trial court, the court held that while it has been held to be error to refuse a defendant's request to impeach a State witness with pending but unproved criminal charges to show bias, no case held the same regarding the mere pendency of a civil suit against an officer charging misconduct unrelated to the defendant's case. The court found that any alleged incentive on the officer's part to testify favorably for the State because of the pending suit was remote and uncertain. Furthermore, the evidence of the suit would be inadmissible to show the officer's propensity to perjure himself. *Cameron*, 189 Ill. App. 3d at 1002-03.

¶ 40　　We are also persuaded by the ruling in *Nelson*. In *Nelson*, defendant confessed to the murders of four people after being questioned by two detectives. Defendant filed a motion to suppress statements which was denied by the trial court. The State then filed a motion *in*

*limine* to bar any testimony regarding a pending federal lawsuit filed against the officers alleging that they coerced a false confession. *Nelson*, 235 Ill. 2d at 419-20. Nelson argued pretrial that the officers used similar interrogation techniques on him which led to his false confession. *Id.* The trial court granted the State's motion *in limine*. On appeal defendant claimed he was deprived of his right to confront the witnesses against him. The supreme court rejected defendant's claim, analogizing defendant's claim to the case of *People v. Davis*, 193 Ill. App. 3d 1001 (1990), and distinguishing it from *People v. Phillips*, 95 Ill. App. 3d 1013 (1981), and *People v. Robinson*, 286 Ill. App. 3d 903 (1997), two cases, *inter alia*, that the instant defendant relies on. See *Nelson*, 235 Ill. 2d at 421-22. The *Nelson* court noted that in *Davis*, defendant was not allowed to cross-examine an officer about unrelated lawsuits that accused him of using excessive force, one of which had been settled out of court, as in the instant case. The trial court refused to allow cross-examination about the lawsuits "due to the lack of disciplinary action and the fact that the pending lawsuit was not related to the defendant's case." *Id.* at 421.

¶ 41     The *Nelson* court observed that, in *Davis*, this court upheld the trial court's ruling, noting that the evidence of bias or motive had to be direct and positive and found "no case where mere evidence of a civil suit against a law enforcement officer charging dereliction of duty unrelated to the case at issue had been held to be proper impeachment." *Id*.

¶ 42     Addressing the defendant Nelson's reliance on *Phillips* and *Robinson*, the court held the cases were easily distinguishable. As the *Nelson* court observed, in *Phillips*, the defendant was charged with attempted murder of an officer and was not allowed to cross-examine the officer with evidence that the officer had previously been suspended 15 times. *Id*. at 422. The *Nelson* court observed that the court in *Phillips* reversed the trial court's ruling, because "the officer might have been motivated to testify falsely to avoid a *further* suspension or termination, and to continue his medical coverage, given his serious injuries." (Emphasis added.) *Id*. In *Robinson*, the defendant was on trial for striking an officer. The defendant alleged that he was charged with the offense to cover up the fact that the officer had lost his temper and struck the defendant. The defendant had also unsuccessfully tried to cross-examine the officer with evidence that the officer was suspended from the police department at the time of Robinson's trial and was to be reinstated within a few days. The *Nelson* court observed that the trial court's ruling was reversed because "the defendant should have been allowed to show that the officer's testimony was influenced by a desire to return to active duty without further trouble and to avoid continued suspension." *Id*.

¶ 43     After distinguishing *Phillips* and *Robinson*, the *Nelson* court upheld the trial court's *in limine* ruling barring cross-examination with regard to the unrelated federal lawsuit. *Id.* In doing so, the court stated:

> "*Defendant here has not identified any disciplinary actions taken against either [detective]* by the police department. Defendant has not cited, nor are we aware of, any case in which cross-examination of the kind proposed by defendant has been permitted *solely on the basis of an unrelated pending civil case*. We therefore conclude that the trial court did not abuse its discretion in granting the State's motion *in limine*." (Emphasis added.) *Id.*

¶ 44        Here, defendant's claim that the officers may have testified falsely because they "would be extremely wary of having an unjustified shooting on their record after a previous shooting had resulted in a settlement" is just the type of speculative claim the *Nelson* court rejected. It is simply an attempt to cross-examine detectives solely on the basis of an unrelated settled lawsuit. Under these circumstances, the trial court acted properly in denying the motion *in limine.* See *People v. Lucas*, 151 Ill. 2d 461, 490-92 (1992) (evidence of witness's prior attack on prison guard too speculative to infer that witness had motive to testify falsely for State in order to regain good-time credit he lost as a result of the attack); *People v. Bull*, 185 Ill. 2d 179, 205-07 (1988) (evidence of expert witness's administrative disciplinary record too remote and speculative to infer that expert had something to gain or lose, *i.e.*, by his favorable testimony, he would improve his " 'perilous job security' ").

¶ 45        As in *Nelson*, there is no evidence whatsoever that the detectives in this case were disciplined in any manner for their involvement in the unrelated civil lawsuit. Indeed, that unrelated lawsuit has no relevance to defendant's claim that the instant detectives were somehow motivated to testify falsely in defendant's case. *Phillips* and *Robinson* lend no support to defendant's claim that the unrelated evidence should have been admitted. In both *Phillips* and *Robinson*, the officers were previously disciplined for their prior conduct and therefore had a motive to testify falsely in their respective cases, *i.e.*, to save their jobs. No such motive exists in this case.

¶ 46        Defendant's reliance on *People v. Chavez*, 338 Ill. App. 3d 835 (2003), is also misplaced. In *Chavez*, this court reversed defendant's conviction because the trial court improperly restricted cross-examination of a police officer in order to explain why the officer would fabricate Chavez's purported oral statement. Defendant sought to question the police officer about defendant Chavez's own lawsuit that he had pending against the Chicago police department for an alleged shooting by a Chicago police officer that left defendant paralyzed. Defendant wanted to testify about and question the officer regarding a statement the officer allegedly made to defendant that defendant would not see any money from the lawsuit and that the officer who shot defendant should have killed defendant when he had the chance. Noting that defense counsel should be given the widest latitude possible while trying to establish bias or motive of a witness, the court held that the comments about the pending lawsuit could have established a motive for the officer to falsely claim that the defendant had confessed to the crime. Ruling that defendant's right to confront the witness against him had been violated, the *Chavez* court reasoned that the officer's alleged comments about the pending lawsuit and the officer's errant aim five years earlier, if believed by the jury, could have established a bias or motive that would explain why the officer would manufacture an oral statement by Chavez. *Id*. at 841-42.

¶ 47        Unlike *Chavez*, evidence of the unrelated lawsuit in this case does not show that the detectives knew defendant before the incident or harbored any bias against defendant. In fact, the evidence demonstrated the officers were looking for Pig, not defendant, when they encountered defendant after he jumped from Pig's car. Evidence of an unrelated lawsuit, settled without a trial, involving multiple officers, where there is no evidence of a finding of guilt and no claims of any disciplinary action taken against the detectives, does not raise an inference of any bias or motive to testify falsely. There is, in fact, no basis to conclude, as

defendant asserts, that "the previous incident surely gave the officers a strong incentive to justify this shooting at all costs as their careers could be significantly impacted by an unjustified shooting." We find, therefore, that the trial court did not violate defendant's constitutional right to confront the witnesses against him and that the court properly denied defendant's motion *in limine*.

¶ 48                                    II. Constitutionality of AUUW Statute

¶ 49    Defendant argues that his AUUW conviction must be vacated because the relevant provisions of the AUUW statute criminalize the open carrying of a loaded rifle outside of one's home, land or fixed place of business and, thus, is facially violative of both state and federal constitutional guarantees of the right to keep a firearm for self-defense. Although defendant did not present this issue to the trial court, a constitutional challenge to a statute may be raised at anytime. *In re J.W.*, 204 Ill. 2d 50, 61-62 (2003). Whether a statute is constitutional is a question of law to be reviewed *de novo*. *People v. Morgan*, 203 Ill. 2d 470, 486 (2003). We hold that the provisions of the AUUW statute at issue here do not violate the constitutional protections of the right to bear arms.

¶ 50    The AUUW statute at issue here provides, in pertinent part, as follows:

"(a) A person commits the offense of [AUUW] when he or she knowingly:

(1) Carries on or about his or her person *** except when on his or her land or in his or her abode or fixed place of business any pistol, revolver *** or other firearm; or

(2) Carries or possesses on or about his or her person, upon any *** public lands within the corporate limits of a city, village or incorporated town, *** except when on his or her own land or in his or her own abode or fixed place of business, any pistol, revolver *** or other firearm; and

(3) One of the following factors is present:

(A) the firearm possessed was uncased, loaded and immediately accessible at the time of the offense[.]" 720 ILCS 5/24-1.6(a)(1), (a)(2), (a)(3)(A) (West 2006).

¶ 51    The second amendment provides that a "well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. The Illinois Constitution provides that "[s]ubject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed." Ill. Const. 1970, art. I, § 22.

¶ 52    In arguing that the AUUW statute violates these constitutional provisions, defendant relies on the United States Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570, 628-29 (2008), and *McDonald v. City of Chicago*, 561 U.S. ___, ___, 130 S. Ct. 3020, 3036 (2010). Defendant acknowledges that this court has consistently rejected defendant's arguments, but asks us to reexamine our holdings.

¶ 53    Defendant is correct that in *People v. Dawson*, 403 Ill. App. 3d 499 (2010), and *People v. Williams*, 405 Ill. App. 3d 958 (2010), this court upheld the AUUW statute after applying

the rational basis test. We agree with defendant that after *McDonald* held that the right to bear arms is a fundamental right, the State may have to meet the heightened requirements of intermediate scrutiny. This level was employed by this court in *People v. Aguilar*, 408 Ill. App. 3d 136, 145-56 (2011), *appeal allowed*, No. 112116 (Ill. May 25, 2011), and in *People v. Mimes*, 2011 IL App (1st) 082747.

¶ 54    In *Aguilar* and in *Mimes*, this court adopted intermediate scrutiny as the appropriate standard to review the defendants' second amendment challenge to their AUUW convictions, which were based on them carrying loaded firearms at a time when they were not in their own homes or places of business. *Aguilar*, 408 Ill. App. 3d at 145-46; *Mimes*, 2011 IL App (1st) 082747, ¶ 72. In *Aguilar*, a majority of the court concluded that the statute's purpose–to allow the State to seek a harsher penalty for violators because of the inherent dangers to police officers and the general public–was substantially related to that important governmental objective and the fit between the statute and that objective was reasonable. *Aguilar*, 408 Ill. App. 3d at 146.

¶ 55    Promoting and ensuring the safety of both the general public and police officers by limiting the accessibility of loaded firearms in public places and on public streets constitutes a substantial or important interest. See *Aguilar*, 408 Ill. App. 3d at 146; *Mimes*, 2011 IL App (1st) 082747, ¶ 76; see also *People v. Ross*, 407 Ill. App. 3d 931, 942 (2011) (the government has an inherent and lawful power of restraint upon private rights as necessary and appropriate to promote society's health, comfort, safety and welfare even though the prohibitions invade an individual's right of liberty). Defendant argues that the challenged prohibition is not limited to individuals carrying a rifle in a sensitive place, like a school or government building. According to defendant, the fact that the *Heller* Court limited its description of places where the right to carry may be infringed to "sensitive" places shows that such prohibition should be the exception rather than the rule. Defendant argues that the Court's language would be meaningless if the home were the only location in which a person could possess a handgun. Defendant's argument, however, is not persuasive. The prohibition at issue here does not criminalize the carrying of rifles everywhere outside the individual's home, land or fixed place of business. Rather, the prohibition impacts the individual right to self-defense based upon factors concerning both where the rifle is carried and the manner in which it is carried. Specifically, if an individual is not on his land or in his home or place of business, then the rifle cannot be carried uncased, loaded and in an accessible manner. It could, however, be carried loaded and inside a case or uncased and unloaded. See *People v. Diggins*, 235 Ill. 2d 48 (2009); *People v. Holmes*, 241 Ill. 2d 509 (2011) (holding that firearms may be transported in the passenger compartment of a motor vehicle if they are unloaded and enclosed in a case). "Certainly, the prohibited place at issue here, *i.e.*, in public on the street, is broad. Nevertheless, the prohibition is justified by the potential deadly consequences to innocent members of the general public when someone carrying a loaded and accessible rifle is either mistaken about his need for self-defense or just a poor shot." *Mimes*, 2011 IL App (1st) 082747, ¶ 79.

¶ 56    As discussed above, the purpose of the AUUW statute is to enhance public and police officer safety by eliminating the inherent threats posed to the public and to law enforcement by loaded and accessible rifles in public on the street. As we said in *Mimes*, "[w]e are not

persuaded by defendant's implication that allowing an individual to carry a loaded and immediately accessible firearm in public for the lawful purpose of self-defense is not very different from that same individual's fundamental right to have a loaded and accessible handgun at home for the lawful purpose of self-defense. In his home, an individual generally may be better able to accurately assess a threat to his safety due to his familiarity with his surroundings and knowledge of his household's occupants. In public, however, there is no comparable familiarity or knowledge, and, thus, an increased danger that an individual carrying a loaded firearm will jump to inaccurate conclusions about the need to use a firearm for self-defense. The extensive training law enforcement officers undergo concerning the use of firearms attests to the degree of difficulty and level of skill necessary to competently assess potential threats in public situations and moderate the use of force." *Mimes*, 2011 IL App (1st) 082747, ¶ 81.

¶ 57     We conclude, therefore, that the fit between the challenged provisions of the AUUW statute and the statute's substantial and important goal is absolutely reasonable although arguably somewhat imperfect. Consequently, defendant's AUUW conviction withstands constitutional attack because the challenged statutory provisions do not violate either the second amendment or the Illinois Constitution. Illinois is not bound to interpret the Illinois Constitution provisions in lockstep with the Supreme Court's interpretation of the federal constitution. *People v. Mitchell*, 165 Ill. 2d 211, 217 (1995). However, while states are free to provide more protection than the United States Constitution requires, they may not provide less. *Simmons v. South Carolina*, 512 U.S. 154, 174 (1994) (Souter, J., concurring, joined by Stevens, J.); *California v. Ramos*, 463 U.S. 992, 1014 (1983). Defendant cites no authority to persuade us that the protection of his right to bear arms under the Illinois Constitution is greater than that afforded under the second amendment.

¶ 58     The judgment of the trial court is affirmed.

¶ 59     Affirmed.

¶ 60     PRESIDING JUSTICE R. GORDON, dissenting:

¶ 61     I must respectfully dissent because, exercising our *de novo* standard of review, I would find that the trial court erred and that the error was not harmless, for the reasons explained below.

¶ 62     In the case at bar, the defense theory of the case was that two detectives falsely accused defendant of exiting a vehicle with weapons in order to justify their shooting him in the back. Whether right or wrong, defendant had a right to present this theory to the jury in its entirety. *People v. Chavez*, 338 Ill. App. 3d 835, 841 (2003).

¶ 63     The key facts in this appeal are not in dispute.

¶ 64     First, there is no dispute that two detectives shot at defendant as he was running away from them and that he suffered gunshot wounds to his back and abdomen. Second, the State makes no claim that defendant had anything to do with the murder that the detectives were investigating at the time. Third, the jurors acquitted defendant of most of the charges against

him. Specifically, they acquitted him of four aggravated assault charges for allegedly pointing a rifle and a handgun at the detectives. Thus, the jurors must have doubted the credibility of the detectives who had testified that defendant had pointed these weapons at them. As the State candidly admits in its brief to this court, "[t]he jury did not believe [the detectives'] testimony with respect to anything that happened after defendant jumped out of the car."

¶ 65    Fourth, although defendant was acquitted of two counts of aggravated unlawful possession of a weapon charges, he was convicted of the one count that charged aggravated unlawful possession of the rifle. Thus, only his alleged possession of the rifle is at issue on this appeal. Fifth, no latent fingerprints from defendant were recovered from the rifle. The State's fingerprint expert testified that the rifle had smooth surfaces which were conducive to leaving latent prints; and the detectives testified that defendant was not wearing gloves and that he held the rifle with both his hands. Sixth, although the detectives testified that defendant pointed a handgun at them while he was in the alley, no handgun was recovered either from defendant, who was arrested in the alley, or from the alley itself.

¶ 66    Seventh, there is no dispute that, when ASA Garbis took a statement from defendant, defendant was in the hospital and on morphine, and had just undergone surgery a few hours before. ASA Garbis testified that defendant looked like he was in pain. Defendant testified that he did not recall speaking to or meeting ASA Garbis before trial. Eighth, the State concedes in its brief to this court that the detectives' testimony was partially impeached with their own statements as memorialized in several police reports.

¶ 67    Building on this foundation of facts, defendant sought to attack the detectives' credibility with evidence that these same detectives had shot at another fleeing suspect who then died. The prior incident occurred approximately a year before the incident at bar, and the prior incident was documented by police reports. Those reports establish that the two incidents were remarkably similar. In the prior incident, the suspect was fleeing from the police and allegedly armed, as in our case. The suspect allegedly pointed a gun at an officer and the same detectives fired at him, as in our case.

¶ 68    As the majority observes, cross-examination is a right protected by both the federal and Illinois constitutions. *Supra* ¶ 34. To satisfy this right, counsel must be permitted to expose facts from which the jurors can draw reasonable inferences about the reliability of the witnesses. *Supra* ¶ 34. When trying to impeach a witness' reliability on cross-examination, the defense should be given "the widest latitude." *Chavez*, 338 Ill. App. 3d at 842. The constitutional requirement must be satisfied first, and only then does the trial court have the discretion to limit the scope of cross-examination. *Supra* ¶ 34. Since the question of whether the trial court violated defendant's constitutional right to confrontation is a purely legal one involving no disputed facts, our standard of review is *de novo*. *People v. Williams*, 238 Ill. 2d 125, 141 (2010) ("defendant's claim that his sixth amendment confrontation right was violated involves a question of law, which we review *de novo*"); *People v. Lovejoy*, 235 Ill. 2d 97, 141-42 (2009) (although "[w]e generally review a trial court's decisions concerning admission of certain testimony for an abuse of discretion [,] *** defendant's claim that his sixth amendment confrontation rights were violated involves a question of law, which we review *de novo*").

¶ 69        The majority finds the *Coleman* case "instructive." *Supra* ¶ 36. In *Coleman*, our supreme court held that the trial court did not err in limiting cross-examination, because "[t]he civil suits defendant wishes to explore do not concern [the officer's] actions in conducting lineups," which was the conduct at issue in that case. *Coleman,* 206 Ill. 2d at 272. By contrast, in the case at bar, the prior incident does concern the same conduct, namely, shooting at a fleeing suspect. Thus, exercising our *de novo* review, I would find that the trial court erred by denying defendant the right to cross-examine the detectives about prior, similar conduct.

¶ 70        The majority cites *Coleman* for the proposition that the factfinder must be able to infer that the officer had a motive to testify falsely. *Supra* ¶ 37. In the case at bar, defendant testified at trial that he had already brought a civil suit against the detectives, and the State has not disputed this fact. Thus, the detectives were aware that they would again be called on to defend their actions in a court of law.

¶ 71        In the case at bar, the State concedes in its brief to this court that, if there was error, the State has the burden of showing that the error was harmless. See also *Chavez*, 338 Ill. App. 3d at 843. To show that an error was harmless, the State must establish, beyond a reasonable doubt, that the error did not contribute to the outcome of the case. *Chavez*, 338 Ill. App. 3d at 843.

¶ 72        The majority did not conduct a harmless error review because it did not find error. The State argued that any error was harmless since there was "sufficient" evidence to convict defendant without the detectives' testimony, and the detectives' testimony was partially impeached by other evidence. However, as explained above, sufficiency is not the standard; harmlessness is. Also, the partial discrediting of the detectives' testimony was not a bar to defendant's seeking to discredit them fully. *Cf. People v. Phillips*, 95 Ill. App. 3d 1013, 1022 (1981) (the existence of "other avenues of impeachment" does not bar defendant' inquiry into an additional impeachment topic).

¶ 73        In the instant case, the only event witness, besides the detectives and defendant, was Philip Willis. Willis, a State witness who had a pending weapons charge at the time of defendant's trial, testified that he did not observe defendant point a rifle or handgun at the detectives, that defendant ran past him and turned a corner, and that he heard gunshots once the detectives turned the same corner. *Supra* ¶¶ 7, 9. Considering all the testimony, the acquittals on all the other charges, and the lack of corroborating physical evidence, such as fingerprints or a gun recovered from defendant or from the alley, I cannot find, beyond a reasonable doubt, that the error did not contribute to the outcome. As a result, I would reverse and remand for a new trial. Thus, I must respectfully dissent.