2021 IL App (1st) 172414-U
No. 1-17-2414

FIRST DIVISION
September 27, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14 CR 18708 |
| | ) | |
| AYISHA ALI, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Michele Pitman, |
| | ) | Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justice Fitzgerald Smith concurred with the judgment.
Justice Cobbs concurred in part and dissented in part.

**ORDER**

¶ 1   *Held:* Defendant's aggravated battery to a peace officer conviction affirmed where: the State presented sufficient evidence to support her conviction and where the court did not abuse its discretion in its rulings concerning the proper scope of cross-examination, the instructions to provide to the jury, or the manner in which it permitted the jury to replay video evidence during deliberations.

¶ 2   Following a jury trial, defendant Ayisha Ali was convicted of aggravated battery to a peace officer and was sentenced to two years' probation. Defendant appeals her conviction arguing: (1) the State failed to prove her guilt of the offense beyond a reasonable doubt; (2) the circuit court

erred in its ruling regarding the permissible scope of cross-examination; (3) the circuit court erred in failing to provide the jury with an adverse inference instruction; and (4) the court abused its discretion in the manner in which it handled the replaying of the surveillance videos of the incident during the course of the jury's deliberations. For the reasons explained herein, we affirm the judgment of the circuit court.[1]

¶ 3      BACKGROUND

¶ 4      On October 2, 2014, defendant was involved in an altercation with Cook County Deputy Sheriff Sharon Mack at the Bridgeview courthouse. During that altercation, defendant purportedly spit on Mack. As a result, she was subsequently charged with two counts of aggravated battery of a peace officer (720 ILCS 5/12-3.05(d)(4)/(i); 720 ILCS 5/12-3.05(d)(4)/(iii) (West 2014)). Defendant elected to proceed by way of a jury trial.

¶ 5      Prior to trial, the State filed a motion *in limine* seeking to introduce evidence that defendant had filed a federal civil lawsuit against the Cook County Sheriff's Department and several individuals, including Deputy Mack, pursuant to section 1983 of the Civil Rights Act (42 U.S.C. § 1983) following the October 2014 incident. In the motion, the State sought permission to introduce evidence of the lawsuit in the event that defendant elected to testify. After considering arguments on the matter, the circuit court granted the motion, finding that the pending lawsuit was

---

[1] This court observes that this appeal was assigned a ready date of February 25, 2020. However, the surveillance video, an exhibit central to this appeal, was not certified at the time the case was made ready. Accordingly, on July 21, 2020, this court ordered that the video be certified and filed with the court. In accordance with that order, the certified video was filed with this court on September 8, 2020. This court, however, was unable to play the video in the format in which it was received and entered an order on September 21, 2020, ordering appellant to refile the exhibit in a different format. Appellant filed a responsive motion on October 14, 2020, explaining that the video could not be reformatted, and this court, in turn, entered an order on April 13, 2021, directing appellant to file a duplicate video with this court by May 14, 2021. This court completed its review of this appeal as expeditiously as possible once it received, and was able to view, the surveillance video footage.

relevant and probative of defendant's potential bias. The court, however, admonished the parties that they would only be able to comment on the existence of the civil suit and the fact that defendant was seeking compensatory and punitive damages. In accordance with the court's ruling, the parties were precluded from introducing any specific facts about the lawsuit or the specific amount of damages sought.

¶ 6      At trial, Deputy Mack, an 18-year veteran with the Cook County Sheriff's Department, testified that on October 2, 2014, she was working at the Bridgeview courthouse. On that day, she was assigned to Post One, the general public security post located at the front entrance of the courthouse. She and her coworker, Deputy Katie Lyons, were responsible for screening members of the general public who entered the courthouse. At approximately 11:30 a.m., Deputy Mack observed "two young gentlemen that were in the lobby causing a commotion." The two men, who were later identified as Omar Ali and Omar Hamuda, had been instructed to leave the courthouse and return later that day. Ali was defendant's brother and Hamuda was defendant's friend. When confronted by the deputies, the two men responded that they were in a public building and that they paid the women's salaries with their tax dollars. The two men then began approaching other people in the lobby and telling them in raised voices that they paid the women's salaries with their tax dollars. After "several minutes," Deputy Mack escorted the two men from the building. Instead of leaving the area, however, the two men remained outside of the courthouse and stood approximately ten feet away from the revolving door. The men began to "harass[]" people who were attempting to enter the premises. As a result, Deputy Mack exited the building and ordered the men to move away from the building. While she was addressing the men, defendant stepped outside, walked between Deputy Mack and the two men, moved her head back,

then forward, and spit on Mack. The spit landed on the lower portion of Deputy Mack's face as well as on her neck and upper chest area.

¶ 7        Deputy Mack testified that she and defendant had not engaged in any "verbal contact" before defendant spit on her. When asked to describe her reaction to being spit on, Deputy Mack recalled that she was "extremely shocked" and "upset." After defendant spit on her, defendant's brother began pulling her backwards and away from Deputy Mack. She, in turn, reentered the courthouse and informed her partner and her lieutenant what had occurred. Defendant, who remained outside the courthouse, was arrested shortly thereafter.

¶ 8        Deputy Mack testified that the Bridgeview courthouse is equipped with a video surveillance system that records events that transpire inside and outside of the courthouse and that the surveillance system recorded her encounter with defendant. She reviewed the surveillance footage of the incident and confirmed that it accurately depicted her interaction with defendant on the morning of October 2, 2014. Surveillance footage of the incident was then published to the jury. As the surveillance footage was shown to the jury, Deputy Mack narrated the events depicted in the video clips.[2] Specifically, she testified that the footage showed her interaction with the two men inside the building and the men being escorted out of the building. It then showed her exiting the courthouse to confront the two men who remained idling by the revolving door. As she was doing so, defendant exited the building, approached the group, "leaned backwards and then motioned forward [and] then spit on" her. The footage then showed Deputy Mack turn around and enter the courthouse.

¶ 9        On cross-examination, Deputy Mack denied that she was upset before she exited the courthouse and confronted the two men whom she had previously escorted outside; rather, she was

---

[2] The surveillance footage does not have an audio component.

"perfectly calm." After defendant spit on her, Deputy Mack testified that she used her left hand to wipe the lower portion of her face and jaw area. She did not recall looking at her shirt and admitted that no photographs were taken of her shirt. Similarly, no DNA swabs were taken from her shirt. Deputy Mack also acknowledged that she spoke to Leann Goshen, an Investigator with the Cook County Sheriff's Department, approximately one hour after the incident. She did not specifically tell Goshen that defendant spat on her neck; rather, she simply relayed that defendant had spit on her and told Goshen the general "area" on which defendant had done so. Deputy Mack testified that she considered her neck and chest be to part of the "same vicinity" on her body. When defense counsel showed Deputy Mack surveillance video clips, she acknowledged that spit particles were not visible in the footage.

¶ 10       Deputy Sheriff Nia Matthews-McCallister, a 28-year veteran with the Cook County Sheriff's Department, testified that she was assigned to work security at the front entrance of the Bridgeview courthouse on October 2, 2014. Specifically, she was assigned to Post 1A, which is the front entrance where court employees, police officers, and attorneys enter the building. Deputies Mack and Lyons, in turn were assigned to Post 1, the separate entrance for the general public. At approximately 11:40 a.m., Deputy Matthews-McCallister observed two men standing near Deputies Mack and Lyons. The men were "very loud and disturbing the public." As a result, Deputies Mack and Lyons escorted the two men out of the building. Instead of leaving the area however, the two men remained in front of the courthouse and stood "about four feet from the revolving doors." They continued to be "very loud" and were "disturbing" members of the public who were trying to enter the building.

¶ 11       As a result, Deputy Mack walked outside to confront the men. Deputy Matthews-McCallister, in turn, walked over to the revolving doors intending to "assist" her. Before she exited the building,

however, Deputy Matthews-McCallister observed defendant approach the group and insert herself in between the two men and Deputy Mack. She then observed defendant "hawk[] and just spit right in [Deputy Mack's] face" and neck. Deputy Matthews-McCallister estimated that she was standing approximately five to six feet away from the group when she observed the incident. She saw the spit leave defendant's mouth and land on Deputy Mack's face and neck. She did not observe or hear defendant say anything to Deputy Mack before or after she spit on her. After Deputy Mack was spit on, she appeared to be in "shock" and began pacing back and forth. Deputy Mack then entered the courthouse and reported the incident to Deputy Lyons and her lieutenant. Deputy Matthews-McCallister, in turn, placed defendant into custody.

¶ 12    Deputy Matthews-McCallister testified that she also reviewed surveillance footage of the incident prior to testifying and confirmed that the footage accurately captured what transpired between defendant and Deputy Mack on October 2, 2014. She also narrated video clips published to the jury. She testified that the video clips captured by various cameras depicted the two male subjects creating a disturbance in the lobby of the courthouse, the men being escorted out of the building, and then Deputy Mack exiting the building shortly thereafter to confront the two men who remained in front of the building. The surveillance footage then showed defendant exit the building, make a movement with her head, and spit on Deputy Mack. Finally, it showed Deputy Matthews-McCallister arresting defendant.

¶ 13    On cross-examination, Deputy Matthews-McCallister acknowledged that she considered Deputy Mack to be a friend. She also acknowledged that although she saw defendant spit on Deputy Mack, she did not immediately arrest defendant; rather, she and Deputy Mack initially both turned and reentered the courthouse together. A short time later, however, she arrested defendant who remained standing outside the courthouse.

¶ 14    Following Deputy Matthews-McCallister's testimony, the State rested its case.  Defense counsel moved for a directed finding, but the circuit court denied the motion.  The defense then called a series of witnesses.

¶ 15    Tracy Harmon, a library attendant at the Bridgeview courthouse, testified that on October 2, 2014, at approximately 11:30 a.m., she left the building to take a cigarette break.  As she was outside, Harmon observed an interaction between two female officers and two young men.  The officers were "yelling and cursing" and telling the men to move away from the front of the building.  The young men, in turn, were "yelling back that they had a right to be there" because it was a public place.  Harmon tried to intervene and told the young men to come over by her because she "didn't want them to get in trouble."  At some point, Harmon observed defendant exit the courthouse and approach the deputies.  Harmon testified that based upon where she was standing, she had a clear view of the interaction.  She never observed defendant spit at either of the deputies.  According to Harmon, defendant did "nothing [b]ut argue."  Harmon viewed video footage of defendant's interaction with the deputies and showed the jury where she was standing in the surveillance video.  Harmon testified that she had never met or seen defendant or either of the young men involved in the altercation prior to that day.

¶ 16    On cross-examination, Harmon estimated that she was standing approximately 15 feet away from the front entrance to the building when she observed the incident at issue.  From that distance, she heard the deputies swear at the two men who were standing in front of the building.  Thereafter, when defendant exited the courthouse, she heard defendant and the deputies exchange words.  Defendant said that she had a right to be there and the deputies responded, "Oh, you think you tough? You think you bad?"  According to Harmon, the interaction "wasn't like an officer and a patron or something.  It was like two people on the street."  Harmon testified that when defendant

exited the courthouse, the two men were standing by her and nothing obstructed her view of defendant. Thereafter, however, she was shown video footage that contradicted her account. The video footage showed the two men standing near the front entrance as defendant exited the building. Although Harmon claimed she had a clear and unobstructed view of defendant, the video clips showed that the two men were standing in between her and defendant. Harmon also acknowledged that she spoke to a Cook County Sheriff's Deputy after she reentered the courthouse following the altercation. She denied, however, that she spoke to Deputy Matthews-McCallister; rather, she testified that she talked to a white male whom she believed was the "boss." Harmon was then shown video footage of her speaking to Deputy Matthews-McCallister. After viewing the footage, Harmon explained that she had been asking to speak to Deputy Matthews-McCallister's boss. She denied that she had a conversation with Deputy Matthews-McCallister in which she stated, "us blacks should stick together"[3] and that Deputy Matthews-McCallister responded, "no, she spit on my partner." Finally, Harmon denied saying that she "did not know" that defendant had done "that" in response to Deputy Matthews-McCallister's statement.

¶ 17 On redirect examination, Harmon testified that her partner was "white" and that she did not "segregate people like that." She further testified that the events she was being asked to recall occurred three years ago. Harmon reiterated, however, that she was "confident that [she] did not see [defendant] spit on [Deputy Mack] in front of that building."

¶ 18 Defendant testified that she was at the Bridgeview courthouse on October 2, 2014, with her brother, Omar Ali, and her friend, Omar Hamuda. Although they arrived together, they did not remain together when they entered the courthouse. When she left the courthouse, defendant observed Ali and Hamuda engaged in "some confrontation" with two deputies. The deputies were

---

[3] Video footage shows that defendant and Deputy Matthews-McCallister are African American, and that Deputy Mack is Caucasian.

"agitated" and were telling Ali and Hamuda to "get the f*** out of here." Defendant turned to Deputy Mack and informed her that they "ha[d] court" and could not just leave. When Deputy Mack again ordered them to "get off the property," defendant called her a "stupid b****." Defendant denied that she ever spit on Deputy Mack. She acknowledged that she viewed video footage of their encounter and that it showed her leaning toward Deputy Mack. Defendant, testified however, that when she leaned toward Deputy Mack, she was not spitting on her; rather, that was when she called her a "stupid b****." Defendant did not observe any spit in the video. Defendant acknowledged, however, that after she leaned toward Deputy Mack, another Sheriff's Deputy told defendant "don't spit on my officer." After she exchanged words with Deputy Mack, defendant testified that she remained standing in front of the courthouse because she was a taxpaying citizen who had a right to be at the building. Shortly thereafter, the deputies reentered the courthouse and defendant thought that was "the end" of the encounter; however, she was arrested "like a minute later." Defendant denied that she ever spit on, or made any kind of physical contact with, Deputy Mack during their encounter.

¶ 19    On cross-examination, defendant testified that when she exited the courthouse that morning, she did not know the reason why Ali and Hamuda had been escorted out of the building and that she had been heading out to her car in the parking lot when she saw them with the two deputies. Defendant denied that her encounter with Deputy Mack made her "angry," but acknowledged she was "agitated by what was being said at the moment." She also acknowledged that her brother grabbed her and pulled her away from Deputy Mack, but denied that he did so because she was angry; rather, he was pulling her away because "there was no more reason to stand there." Finally, defendant admitted that she filed a lawsuit against Cook County and Deputies Mack and

Matthews-McCallister. She explained that she was suing for punitive and compensatory damages because she had been "falsely arrested."

¶ 20    Leann Goshen, a Deputy Sheriff with the Cook County Sheriff's Department, testified that she was responsible for investigating crimes that occur at Cook County courthouses. On October 2, 2014, she was assigned to investigate the alleged spitting incident that occurred at the Bridgeview courthouse. As a part of that investigation, she interviewed Deputy Mack approximately one hour after the incident occurred and authored a report in which she memorialized Mack's account of the altercation. In her report, Deputy Goshen indicated that Deputy Mack relayed that defendant spat on her "chest area." Her report did not contain any reference to any spit landing on Deputy Mack's face or neck. Deputy Goshen testified that she would have included that detail if Deputy Mack had relayed it to her.

¶ 21    After calling the aforementioned witnesses, defense counsel rested. The State then recalled Deputy Matthews-McCallister to testify as a rebuttal witness. She testified that shortly after the incident, she returned to her post inside the courthouse and was approached by Harmon, a library attendant. Deputy Matthews-McCallister stated that she and Harmon did not speak regularly and that it was unusual for Harmon to approach her and engage her in conversation. During the conversation, Harmon remarked, "You know us blacks should stick together." In response, Deputy Matthews-McCallister stated, "No, she spat on my partner." Harmon, in turn, replied: "I didn't know that. She shouldn't have done that." Deputy Matthews-McCallister estimated that the conversation lasted "about one to two minutes."

¶ 22    On cross-examination, Matthews-McCallister testified that she included the conversation she had with Harmon in a report that she completed about the incident; however, her report was

subsequently lost. She did not recall whether she mentioned the conversation when she spoke to James Dolehide, another investigator who was assigned to review the incident.

¶ 23 Thereafter, the parties stipulated that James Dolehide, a Cook County Sheriff's Investigator, interviewed Deputy Matthews-McCallister on October 2, 2014, at approximately 1:42 p.m. Deputy Matthews-McCallister did not discuss Harmon's remark about "blacks" needing to "stick together" during that conversation.

¶ 24 After presenting the aforementioned evidence, the parties delivered their closing arguments. The circuit court then provided the jury with a series of relevant instructions and the jury commenced deliberations. During deliberations, the jury made several requests to review the surveillance video footage.[4] After viewing the footage, the jury ultimately returned with a verdict finding defendant guilty of aggravated battery of a peace officer.

¶ 25 Defendant's posttrial motion was denied and she was subsequently sentenced to two years' probation. She was also ordered to complete 10 days of community service and attend anger management classes. This appeal followed.

¶ 26 ANALYSIS

¶ 27 Sufficiency of the Evidence

¶ 28 On appeal, defendant first challenges the sufficiency of the evidence. She argues that the State failed to prove that she actually spit on Deputy Mack where spit particles are not visible in the surveillance footage and where the testimony of Deputies Mack and Matthews-McCallister was "improbable, impeached and contrary to human experience."

---

[4] The jurors also asked for transcripts of trial testimony; however, they were informed that no such transcripts were available.

¶ 29    The State, in turn, responds that defendant's challenge to the sufficiency of the evidence lacks merit because "the overwhelming evidence established that [she] knowingly spat at Deputy Mack."

¶ 30    Due process requires proof beyond a reasonable doubt to convict a criminal defendant. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). In reviewing a challenge to the sufficiency of the evidence, it is not a reviewing court's role to retry the defendant; rather, the court must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found each of the essential elements of the crime beyond a reasonable doubt. *People v. Ward*, 215 Ill. 2d 317, 322 (2005); *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 58. This standard is applicable to all criminal cases regardless of the nature of the evidence at issue. *People v. Bush*, 214 Ill. 2d 318, 327 (2005). The trier of fact is responsible for evaluating the credibility of the witnesses, drawing reasonable inferences from the evidence, and resolving any inconsistencies in the evidence (*People v. Bannister*, 378 Ill. App. 3d 19, 39 (2007)), and a reviewing court should not substitute its judgment for that of the trier of fact (*People v. Sutherland*, 223 Ill. 2d 187, 242 (2006)). Ultimately, a reviewing court will not reverse a defendant's conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to his or her guilt. *People v. Carodine*, 374 Ill. App. 3d 16, 24 (2007).

¶ 31    A person commits aggravated battery of a battery of a peace officer when she commits a battery against an individual whom she knows to be a peace officer performing his or her official duties or in retaliation for performing his or her official duties. 720 ILCS 5/12-3.05(d)(4)(i), (4)(iii) (West 2014). A person, in turn, commits a battery when she knowingly causes bodily harm to, or makes physical contact of an insulting or provoking nature with, another individual. 720 ILCS 5/12-3(a) (West 2014). Here, there is no dispute that Deputy Mack was a peace officer performing

her official duties during her interaction with defendant. There is likewise no dispute that the act of spitting on another person constitutes contact of an insulting or provoking nature. See *e.g., People v. Pena*, 2014 IL App (1st) 120586, ¶¶ 19-20. Instead, defendant's challenge to the sufficiency of the evidence is based on her contention that the State failed to meet its burden of proving that she performed the act at issue and spit on Deputy Mack. She argues that the testimony of Deputies Mack and Matthews-McCallister was not credible and was entirely contradicted by the video evidence.

¶ 32    Viewing the evidence that was presented in the light most favorable to the State however (*Ward*, 215 Ill. 2d at 322), we find the evidence sufficient to uphold defendant's conviction. At trial, Deputies Mack and Matthews-McCallister detailed Mack's encounter with defendant. Both deputies testified that defendant exited the courthouse as Deputy Mack was engaged in a confrontation with defendant's brother and friend. Defendant walked over to the group, and without exchanging any words with Deputy Mack, jutted her head forward and spit on Mack. Deputy Mack returned to the courthouse, reported what had occurred, and Deputy Matthews-McCallister arrested defendant shortly thereafter. Although defendant is correct that Deputy Matthews-McCallister evidenced some confusion at trial as to what side of Deputy Mack's body that defendant spit on and that Deputy Mack failed to tell the investigator that the spit landed on her face and neck in addition to her chest, we find these discrepancies minor and reiterate that both deputies testified consistently that defendant spit on Mack's upper body. See generally *People v. Gray*, 2017 IL 120958, ¶ 25 ("Minor discrepancies in testimony affect only its weight and will not render it unworthy of belief").

¶ 33    In addition, although defendant and defense witness Holman both offered different accounts of the incident provided by the deputies, the jury heard the divergent accounts, and based on its

verdict, evidently found the testimony offered by the State's witnesses to be more credible. We reiterate that the trier of fact is responsible for evaluating the credibility of witnesses and resolving inconsistencies in the evidence and a reviewing court will not substitute its judgment for that of the trier of fact simply because the defendant characterizes the State's witnesses as incredible. See *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60 (quoting *People v. Brown*, 185 Ill. 2d 229, 250 (1998), quoting *People v. Byron*, 164 Ill. 2d 279, 299 (1995)) (" 'A conviction will not be reversed "simply because the defendant tells us that a witness was not credible" ' "). Indeed, although defendant characterizes Harmon as a "purely unbiased third-party witness" with "absolutely no incentive to lie," Harmon acknowledged that her recollection of the events that transpired was not entirely consistent with the images captured by the surveillance video. For example, she testified that defendant's brother and friend were standing by her when defendant interacted with Deputy Mack and that her view was unobstructed; however, the video showed that Ali and Hamuda were standing by Deputy Mack near the building's revolving doors when defendant exited the building and approached Mack. In addition, Harmon did not recall conversing with Deputy Matthews-McCallister following the incident, but the surveillance footage showed that such a conversation did occur.

¶ 34        Ignoring these inconsistencies, defendant, argues that it was the testimony of Deputies Mack and Matthews-McCallister that was "directly contradicted" by the surveillance video footage. According to defendant, the footage "affirmatively and unambiguously establish[ed]" that she did not spit on Deputy Mack. We disagree; rather, the surveillance footage is inconclusive. The clearest video of the incident was captured by a camera located inside the lobby of the building that faced outwards. The video showed Deputy Mack interacting with defendant's brother and friend outside of the building. During this interaction, defendant exited the courthouse via the

revolving door. After she exited the building, defendant looked toward the men. She then took a step to her right toward Deputy Mack. As she did so, defendant made a movement with her head and her mouth. Her mouth then became obstructed by one of the door frames. Following defendant's movement in her direction, Deputy Mack turned around and entered the courthouse. The entire encounter between defendant and Deputy Mack lasted mere seconds and no words appear to have been exchanged between defendant and Mack before defendant made the movement with her head.

¶ 35    Defendant acknowledges that the video footage appears to be "generally consistent" with Deputy Mack's version of events in that it shows that she made a movement with her head and mouth when interacting with Deputy Mack; however, she argues that the Deputy Mack's claim she was spit on is rebutted by the fact that no spit particles are visible on the video. Although the resolution and quality of the video footage entered into evidence does not permit a viewer to see any actual spit particles, it does not flatly contradict the testimony of Deputies Mack and Matthews-McCallister about what transpired during Mack's encounter with defendant. Indeed, while the quality of the video evidence could certainly be better, this is not a situation where the video evidence rendered witness testimony utterly improbable, unconvincing, or contrary to human experience warranting reversal of defendant's conviction. *Cf. People v. Shaw*, 2015 IL App (1st) 123157, ¶ 29 (reversing the defendant's conviction where video evidence was wholly inconsistent with live witness testimony rendering the testimony too improbable, unconvincing, and contrary to human experience). We reiterate that the jury heard differing accounts of defendant's interaction with Deputy Mack and viewed surveillance footage that appeared to corroborate the State's witnesses accounts of the event. Contrary to defendant's claim, the video footage did not contradict or impeach the deputies' testimony; rather, the video is merely unclear.

Accordingly, we find no basis to disturb the jury's credibility determinations and reject defendant's challenge to the sufficiency of the evidence. See, *e.g., Pena*, 2014 IL App (1st) 120586, ¶¶ 21-22 (rejecting the defendant's claim that the State failed to prove that he spit on a corrections officer simply because video of the incident did not actually show any spit).

¶ 36    Evidentiary Ruling

¶ 37    Defendant next contends that the circuit court abused its discretion when it permitted the State to introduce evidence that she had filed a federal civil rights lawsuit against Cook County and Deputies Mack and Matthews-McCallister following the incident at the courthouse.

¶ 38    The State, in turn, responds that the circuit court "properly allowed the limited cross-examination of defendant regarding her pending civil lawsuit against Cook County and the witnesses involved in th[e] case to show possible interest or bias."

¶ 39    Evidentiary rulings are within the sound discretion of the circuit court and will not be reversed absent an abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001); *People v. Hatchett*, 397 Ill. App. 3d 495, 506 (2009). More specifically, the circuit court's decisions concerning the proper evidentiary scope of cross-examination will be upheld absent an abuse of discretion. *People v. Reese*, 2017 IL 120011, ¶ 75. An abuse of discretion will be found only where it can be determined that the trial court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991); *People v. Rush*, 401 Ill. App. 3d 1, 13 (2010).

¶ 40    It is well established that a witness's potential bias or motive to testify falsely is a proper subject for cross-examination. *People v. Mason*, 28 Ill. 2d 396, 400 (1963). Given that "[t]he actual pendency of civil litigation is relevant as tending to show the bias or interest of a witness," courts have held the existence of such suits "is thus a proper subject matter of cross-examination."

*People v. Martinez*, 120 Ill. App. 3d 305, 308 (1983); see also *People v. Crosser*, 117 Ill. App. 3d 24, 29 (1983) ("Bias, in the form of hostility toward a party, may be shown by the fact that the witness has a lawsuit pending against that party").

¶ 41        Here, prior to trial, the State filed a motion *in limine* seeking the court's permission to introduce evidence that defendant filed a civil rights lawsuit against Cook County and Deputies Mack and Matthews-McCallister in the event that defendant chose to testify. The State argued that such evidence was important for impeachment purposes as it was demonstrative of defendant's potential bias and motive to testify falsely. Defense counsel, in turn, objected, arguing that evidence of defendant's federal §1983 lawsuit was more prejudicial than probative given the potential financial impact the suit would have on the County and on the jurors, who were taxpayers. After considering the arguments of the parties, the court granted the State's motion *in limine* and held that the State would be able to impeach defendant by presenting evidence of her federal lawsuit if defendant elected to testify. The court, however, cautioned the parties that it would not permit the parties to engage in a mini-trial concerning the pending lawsuit; rather, the State would simply be allowed to introduce evidence of the existence of the lawsuit and the parties at issue as well as the fact that defendant was seeking compensatory and punitive damages.

¶ 42        Thereafter, in accordance with the court's ruling, the State posed three questions to defendant about her pending federal civil lawsuit during cross-examination: "You have a lawsuit pending against Cook County, correct?"; "You have a lawsuit pending as part of that same lawsuit against those two deputies, Deputy Mack and Deputy Matthews McCallister, correct?"; and "You are suing for punitive and compensator[y] damages, correct?"[5] Defendant responded affirmatively to

---

[5] The State did attempt to ask defendant one additional question about the money she had the potential to gain as a result of the civil suit. Specifically, the State inquired: "So you stand to

each of those questions. The State did not make any further mention of or reference to defendant's civil suit.[6]

¶ 43    Upon review, we are unable to conclude that that the circuit court's ruling on this matter was arbitrary and unreasonable and constituted an abuse of discretion. Although defendant acknowledges that the pendency of civil litigation may be of "some relevance" to show a criminal defendant's interest or bias in the outcome of a criminal proceeding, she apparently argues that an exception should be made for federal § 1983 claims where the relevant statute of limitations periods governing such claims require criminal defendants to file suit before the completion of their criminal proceedings. She argues that allowing cross-examination of such claims puts criminal defendants in the untenable position of having to choose between the constitutional right to be free from false arrest and the right to a fair criminal trial and to testify on his or her behalf. We disagree. Initially, we note that defendant fails to cite any controlling legal authority to support her claim that federal § 1983 lawsuits should be treated differently from other lawsuits and should not be permitted to be used to cross-examine criminal defendants.[7] Moreover, although we acknowledge that defendant, in order to comply with the statute of limitations applicable to her

---

make a lot of money based on your testimony here today?" Defense counsel, however, objected to that inquiry and the circuit court sustained the objection.

[6] Interestingly, even though the State made no mention of defendant's civil lawsuit in its closing argument, defense counsel referenced the civil suit when he delivered his closing remarks, stating: "There is a civil lawsuit, sure, okay. [Defendant] was falsely arrested and she knows she was falsely arrested. She knows it. And I contend if any one of you were falsely arrested, too, and went through what she went through, you'd file that same lawsuit. That's why we have these kinds of courts in this case, but it also gives the defense a reason to do what they're doing and lie."

[7] Defendant cites to a transcript of a United States Supreme Court oral argument where the potential use of a federal §1983 suit to impeach a criminal defendant was discussed; however, such discussions do not constitute binding legal authority.

§1983 claim, was required to initiate her suit while her criminal charges remained pending,[8] the record rebuts her claim that she was impermissibly required to choose between two competing constitutional rights. Indeed, there is no dispute that the filing of the civil suit did not prevent defendant from exercising her constitutional right to testify. Accordingly, we do not find that the circuit court, by allowing her to be subjected to a limited cross-examination on the subject, infringed upon her right to a fair trial.

¶ 44    We are also unpersuaded by defendant's claim that the references to her civil lawsuit could have somehow led the jury to "confuse the burden of proof between a criminal and civil matter." As set forth above, the circuit court limited the extent to which the parties could discuss defendant's civil lawsuit. In accordance with the court's ruling, the State posed three short questions to defendant and her answers simply established that she had filed suit against the County and Deputies Mack and Matthews-McCallister and was seeking damages as a result of their conduct. We are unpersuaded that this limited discussion of defendant's federal lawsuit led the jury to confuse the burden of proof applicable to her criminal trial especially given the fact that the instructions the circuit court provided to the jury at the end of the trial clearly set forth the relevant legal principles governing the case, including the State's burden of proof. Specifically, the court instructed: "The State has the burden of proving the guilt of Defendant beyond a reasonable doubt and this burden remains on the State throughout the case. The Defendant is not required to prove her innocence."

---

[8] Defendant's federal suit was subject to a two-year statute of limitations. See *Wallace v. Kato*, 549 U.S. 384, 388, 397 (2007) (holding that a federal § 1983 claim seeking damages for false arrest is subject to the statute of limitations for personal injury torts in the state in which the claim is filed, which is 2 years in Illinois (735 ILCS 5/13-202 (West 2014)), and "begins to run at the time the claimant becomes detained pursuant to legal process"). Here, defendant was arrested and detained on October 2, 2014, and was thus required to file suit by October 2, 2016. Defendant's criminal trial, however, did not commence until August 28, 2017.

¶ 45    We reiterate that the circuit court is afforded broad discretion in its rulings concerning the admissibility of evidence and the scope of cross-examination. *Reese*, 2017 IL 120011, ¶ 75. Here, the court determined that the existence of defendant's civil suit was a proper subject for cross-examination, but limited the extent to which the parties could discuss the suit. Although we are sympathetic to potential timing conflicts resulting from confluence of the statute of limitations for federal § 1983 claims and the progression of criminal proceedings in the Illinois criminal court system, Illinois courts have consistently recognized that the existence of pending civil litigation is a proper subject for cross-examination. *Martinez*, 120 Ill. App. 3d at 308; *Crosser,* 117 Ill. App. 3d at 29. There is simply no existing controlling case law that supports defendant's argument that § 1983 lawsuits should be exempt from this general rule. Ultimately, based on the applicable law and our review of the record, we reject defendant's claim that the circuit court's ruling constituted an abuse of discretion. Moreover, even if we could agree with our dissenting colleague's conclusion that the circuit court's ruling in this vein constituted error, we would nonetheless similarly find that any such error was harmless in light of the evidence against defendant.

¶ 46    Jury Instructions

¶ 47    Defendant next argues that the circuit court abused its discretion when it denied her request to provide the jury with an adverse inference jury instruction in response to Matthews-McCallister's admission that the report she had completed following the incident had been lost.

¶ 48    The State, in turn, responds that the court did not abuse its discretion in denying defendant's proposed non-IPI adverse inference instruction where the evidence did not support giving that instruction.

¶ 49    "The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence so that the jury may reach a correct conclusion according to the law and

evidence." *People v. Wales*, 357 Ill. App. 3d 153, 157 (2005). As a general rule, there must be "some evidence" in the record to support giving a specific instruction and it is the province of the circuit court to ascertain whether an instruction should be given based on the issues raised and the evidence presented at trial. *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). Whenever applicable, the circuit court should instruct the jury in accordance with an Illinois Pattern Jury Instruction (IPI) as long as the instruction accurately states the law. ILCS S. Ct. R. 451(a); *People v. Hudson*, 222 Ill. 2d 392, 399-400 (2006); *People v. Danielly*, 274 Ill. App. 3d 358, 367 (1995). A non-IPI instruction should only be provided in criminal cases where the criminal set of IPI instructions do not contain an accurate instruction and where the proposed non-IPI instruction is simple, brief, impartial, and free from argument. *Danielly*, 274 Ill. App. 3d at 367. In evaluating the propriety of a set of jury instructions, the relevant inquiry is "whether the instructions, considered together, fully and fairly announce the law applicable to the theories of the State and the defense." *Mohr*, 228 Ill. at 65. In order to ascertain whether the instructions fully and fairly apprised the jury of the applicable law and the theories of both parties and avoided being confusing or misleading, the instructions should be considered in their entirety and not viewed in isolation. *People v. Parker*, 223 Ill. 2d 494, 501 (2006). The circuit court's determination that a tendered instruction is not supported by the evidence will not be disturbed absent an abuse of discretion. *People v. McDonald*, 2016 IL 118882, ¶ 20; *People v. French*, 2020 IL App (1st) 170220, ¶ 20. An abuse of discretion will only be found " 'if the jury instructions are not clear enough to avoid misleading the jury.' " *Mohr*, 228 Ill. 2d at 66 (quoting *In re Timothy H.*, 301 Ill. App. 3d 1008, 1015 (1998)). Even where there is an error with respect to a set of jury instructions, reversal is not warranted unless it is evident that the jury was actually misled and that the verdict prejudiced the defendant. *Polk*, 407 Ill. App. 3d at 108.

¶ 50    At trial, the State called Deputy Matthews-McCallister as a rebuttal witness to dispute the testimony provided by Harmon.  As a defense witness, Harmon denied that she made a statement to Deputy Matthews-McCallister after the incident in which she referenced the need for "blacks" to "stick together."  In rebuttal, Deputy Matthews-McCallister testified that Harmon had, in fact, made that statement.  When cross-examined by defense counsel, Deputy Matthews-McCallister confirmed that she completed a police report about the spitting incident and that she had documented Harmon's statement in that report.  Deputy Matthews-McCallister further testified that the report had been lost.  In surrebuttal, defendant presented the stipulated testimony of Investigator Dolehide.  Pursuant to the stipulation, Investigator Dolehide would testify that he interviewed Deputy Matthews-McCallister shortly after the incident and that she did not mention that she had engaged in a conversation with Harmon or that Harmon had made such a statement.

¶ 51    Thereafter, at the jury instruction conference, defense counsel requested the circuit court to provide the jury with an adverse inference instruction.  The language contained in defendant's non-IPI instruction was as follows: "If you find that the State has allowed to be destroyed or lost any evidence whose content or quality are in issue, you may [infer] that the true fact is against the State's interest."  The State, in turn, objected to defendant's proposed non-IPI jury instruction request, arguing that such an instruction was not applicable because police reports are not admissible evidence; rather, their use is limited to impeachment.  The circuit court agreed reasoning that police reports are "not evidence;" rather, they are "loaded with hearsay."  The court concluded that an adverse inference instruction only applies "to actual physical evidence that was destroyed by the State or the police who would be an arm of the State."  Accordingly, the court denied defendant's instruction request.  The court noted, however, that there was nothing

prohibiting defense counsel from raising the issue of Deputy Matthews-McCallister's lost report in his closing argument.

¶ 52     On review, we find no abuse of discretion.  As a threshold matter, we note that the Criminal Illinois Pattern Jury Instructions do not contain an adverse inference instruction.  See *People v. Blackwood*, 2019 IL App (3d) 160161, ¶ 21 (noting that while the Civil Illinois Pattern Instructions do contain an adverse inference missing evidence instruction, "there is no comparable missing evidence instruction in the criminal jury instructions").  We further find that the proposed non-IPI adverse inference instruction that defendant tendered was not justified based on the evidence.  Although defendant argues Deputy Matthews-McCallister's rebuttal testimony referencing a lost police report justified an instruction informing the jury that it could infer that any lost or destroyed "*evidence* whose content or quality are in issue" (emphasis added) was adverse to the State, the circuit court, in denying the tendered instruction, correctly observed that police reports are not evidence.  *People v. Herndon*, 2015 IL App (1st) 123375, ¶ 40; see also *People v. Williams*, 240 Ill. App. 3d 505, 506 (1992) (recognizing that "[w]hile it is true that police reports may be used for impeachment or refreshing a witness' recollection, it is well-settled that police reports are inadmissible hearsay not subject to any recognized exception to the hearsay rule" and may not be used as substantive evidence of guilt against a defendant).  Indeed, while non-IPI adverse inference instructions have been utilized in some criminal cases where actual admissible physical evidence has been lost or destroyed (see, *e.g., Danielly*, 274 Ill. App. 3d at 368 (finding that an adverse inference instruction was appropriate in an aggravated criminal sexual assault case where police returned the victim's underwear, which was subsequently destroyed and unavailable as evidence at trial), defendant cites no authority permitting the use of such an instruction when the item that is missing or destroyed is

inadmissible non-evidence. See Ill. S. Ct. R. 341(h) (requiring appellant to support its argument with relevant legal authority). As such, we find that the evidence did not support the use of an adverse inference instruction.

¶ 53       We are likewise unpersuaded that defendant's proposed non-IPI adverse inference instruction was justified as a "sanction" for the State's loss of the report, which defendant characterizes as a "discovery violation." Initially, we note that at trial, defendant never argued that the loss of Matthews-McCallister's report constituted a discovery violation or that the adverse inference instruction was warranted as a sanction for said violation. Even if defendant had made that argument, we do not find that the use of defendant's non-IPI instruction would have been appropriate as a sanction given that it was not supported by the evidence.

¶ 54       Ultimately, we find that the series of IPI instructions that the circuit court did provide to the jury accurately stated the applicable law and relevant governing legal principles. Indeed, the jury received instructions on the elements of the offense, the presumption of innocence, the burden of proof, and the credibility of witnesses. Accordingly, we reject defendant's contention of error with respect to the instructions the circuit court provided to the jury.

¶ 55       Surveillance Footage

¶ 56       Lastly, defendant contends the circuit court erred in the manner in which it permitted the jury to re-watch the surveillance video evidence during its deliberations.

¶ 57       The State, in turn, argues that "the manner in which the court allowed the jury to [view] video footage during deliberations did not constitute an abuse of discretion."

¶ 58       As a threshold matter, defendant acknowledges she never objected to the manner in which the circuit court permitted the jury to re-watch surveillance footage during the trial and did not include the issue in her posttrial motion, and thus failed to properly preserve this claim for review. See

*People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (recognizing that to properly preserve an issue for appeal, a defendant must object to the purported error at trial and specify the error in a posttrial motion and that her failure to satisfy both requirements results in forfeiture of appellate review of her claim). In an effort to avoid forfeiture, however, defendant invokes the plain error doctrine, which provides a limited exception to the forfeiture rule and allows for review of forfeited issues on appeal if the evidence is closely balanced or the error is of such a serious magnitude that it affected the integrity of the judicial process and deprived the defendant of her right to a fair trial. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967); *People v. Belknap*, 2014 IL 117094, ¶ 48; *People v. Sargent*, 239 Ill. 2d 166, 189 (2010); *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). The first step in any plain error analysis is to determine whether any error actually occurred. *Piatkowski*, 225 Ill. 2d at 565; *People v. Rinehart*, 2012 IL 111719, ¶ 15. If an error is discovered, defendant then bears the burden of persuasion to show that the error prejudiced her. *Sargent*, 239 Ill. 2d at 189-90.

¶ 59 The circuit court is afforded discretion to grant or deny a jury's request to review evidence during deliberations. *People v. Hollahan*, 2020 IL 125091, ¶ 11; *People v. Cruz*, 2021 IL App (1st) 190132, ¶ 78; *People v. Rouse*, 2014 IL App (1st) 121462, ¶ 77. The court is likewise afforded discretion to determine the manner and mode in which it permits jurors to review specific pieces of evidence. *People v. McKinley*, 2017 IL App 3d 140752, ¶ 22. Accordingly, the court's decisions concerning such matters will not be disturbed absent an abuse of that discretion. *Rouse*, 2014 IL App (1st) 121462, ¶ 77.

¶ 60 In this case, during deliberations, the jury submitted several notes to the circuit court requesting to review the surveillance footage shown during the trial. In the first note, the jury inquired, "Could we see the videos again?" Upon receipt of the note, the court conferred with the attorneys from

both parties and sought clarity as to which video clips the jury wanted to review. In response to the court's inquiry, the jurors clarified that they wanted to see "the video shot from inside the lobby through the revolving doors that shows the moment of the incident at normal speed." The jurors were then brought back into the courtroom to view the video in the presence of defendant, both attorneys, and the judge. Prior to replaying the video, the court instructed the jurors not to speak or comment on their deliberations while viewing the video. After the video was played, the court inquired whether the jurors wanted to view it again. One of the jurors requested that another portion of the video be played, and the jury was then shown the requested footage. No additional video footage was requested and the jury returned to the jury room. Several hours later, the jury sent out another note asking to "watch the same two videos at normal speed again." The court again permitted the jury to re-watch the surveillance footage in the courtroom. This time, however, no one remained in the courtroom while the jury watched the video clips. After reviewing the requested material, the jury returned to the jury room and again resumed deliberations. Shortly thereafter, however, the jury sent out a final note requesting to see the second video clip "zoomed in to where the defendant moves forwards toward Deputy Mack." Because defense counsel was the only one who used the zoom feature during trial, defense counsel operated the computer and showed the jurors the zoomed-in video clip that they requested to see. After the jurors viewed the zoomed-in video, the court instructed them to return to the jury room and continue with their deliberations. The jury did so and ultimately returned with a guilty verdict.

¶ 61    On appeal, defendant acknowledges that the court is afforded discretion to grant or deny a jury's request to review evidence (*Hollahan*, 2020 IL 125091, ¶ 11) and to determine the manner in which the jury reviews such evidence (*McKinley*, 2017 IL App 3d 140752, ¶ 22), and does not challenge the methodology the court used to allow the jury to review the surveillance footage

during its deliberations. [9] Instead, she simply takes issue with the fact that the court purportedly improperly limited the jury to a single viewing of the zoomed-in video footage. She notes that the first time the jurors re-watched surveillance footage during deliberations, they were shown the footage in open court and the court inquired whether they wanted to view it again before they returned to the jury room. On the second occasion the jurors returned to the courtroom to review surveillance footage, they were left alone in the courtroom and were permitted to review the material as many times as they wanted before they returned to the jury room. In contrast, when the jurors returned to the courtroom a final time to view the zoomed-in video footage, they were shown the footage by defense counsel, and afterwards, the court instructed the jurors to return to the jury room to resume their deliberations. The court did not inquire whether the jurors wanted defense counsel to replay the zoomed-in video clip or specifically advise them that they were permitted watch the zoomed-in footage as many times as they desired.

¶ 62    We acknowledge no such inquiry was made; however, we do not find that the record supports defendant's contention of error. Although the jurors were not advised that they were permitted to view the zoomed-in footage multiple times, they were likewise not explicitly informed that they were limited to a single viewing of the footage. Given that the court accommodated each of the jury's prior requests to review surveillance footage, we do not believe that jurors would have reasonably believed that they could not have requested additional viewings of the zoomed-in video clip if desired. We decline to equate the court's failure to advise the jurors that they were entitled to multiple viewings of the video clip as an explicit limitation on their ability to do so. Put simply,

---

[9] At the time defendant filed her reply brief, she noted that there was a split in authority regarding the propriety of allowing a jury to view video footage in the presence of the parties and the court after a jury commenced deliberations. During the pendency of this appeal, however, the supreme court addressed this issue and held that such a practice does not constitute error. See *Hollahan*, 2020 IL 125091.

the court did not, as defendant suggests, improperly limit the jury's ability to view the surveillance footage at issue.  Absent error, there is no plain error.  *People v. Hood*, 2016 IL 118581, ¶ 18.

¶ 63     CONCLUSION

¶ 64      The judgment of the circuit court is affirmed.

¶ 65      Affirmed.

¶ 66      JUSTICE COBBS concurring in part, and dissenting in part:

¶ 67      I concur with the majority that defendant's conviction must be affirmed. I believe the evidence in this case is sufficient upon which to convict. Cases addressing sufficiency are replete. Suffice it to say that the credible testimony of even a single witness is sufficient upon which to convict. See Illinois Evidence Manual, § 21.5 (4th ed.) (citing cases). Thus, long before videocam and phone cameras, convictions have been affirmed based on witness testimony alone. An unclear video of the event that occurred just outside of the Markham courthouse cannot defeat the testimony, which in this case, the jury found credible. I further concur with the majority's ruling on the issues of jury instructions and surveillance footage.

¶ 68      I write separately, however, because I believe that the State's motion *in limine* regarding defendant's civil trial should have been denied and no evidence of that complaint, filed subsequent to the occurrence of the charged event, should have been permitted. Accordingly, I respectfully dissent from the aspect of the majority's disposition.

¶ 69      At pretrial, the State filed a motion *in limine* to introduce the fact that defendant had filed a 1983 civil rights lawsuit in federal court naming in the complaint Cook County and Deputies Mack and Matthews-McCallister. The purpose given in support of the motion was to show the defendant's bias or motive to testify falsely. Over defendant's objection, the trial court allowed the motion to impeach should defendant elect to testify but cautioned that there would be no trial

within a trial. The scope of the State's impeachment was defined by the court to include the fact of the lawsuit, the named parties, and the fact that defendant was seeking compensatory and punitive damages. At trial, defendant testified in her own defense. On cross-examination, the following colloquy occurred:

" Q. [MR. BUCCI, State's Attorney]: You stand to make a lot of money based on your testimony today, don't you?

MR. DVORAK [Defense Counsel]: Objection to the form of the question.

THE COURT: Sustained to the form.

Q. You have a lawsuit against Cook County, correct?

A. [DEFENDANT]: Yes.

Q. You have a lawsuit pending as part of that same lawsuit against those two deputies, Deputy Mack and Deputy Matthews McCallister, correct?

A. Yes, I do.

Q. Are you suing Cook County for compensator[y] and punitive damages, correct?

A. I'm suing them for falsely arresting me.

MR. BUCCI: Objection. Nonresponsive.

THE COURT: Sustained

Q. You are suing for punitive and compensator[y] damages, correct?

A. Yes.

Q. So you stand to make a lot of money based on your testimony here today?

MR. DVORAK: Objection to the form of the question and violates the motion.

THE COURT: Sustained.

¶ 70    No limiting instruction was offered by the court either prior to or at the close of the defendant's testimony. In an apparent attempt to diminish any prejudicial effect of the civil suit evidence, in closing argument defense counsel acknowledged the fact of the suit and offered a rationale for its filing. Prior to deliberations, the jury was instructed that any evidence that was received for a limited purpose should not be considered for any other purpose. The jury was additionally instructed that "[i]n considering testimony of any witness, you may take into account any interest, bias or prejudice."

¶ 71    On appeal, as she did below, defendant argues that the admission of the fact of her civil lawsuit was prejudicial. I agree. Not only was the evidence of defendant's civil suit, filed subsequent to the charged criminal offense, irrelevant on the issue of defendant's guilt, but it also had the tendency to destroy the presumption of innocence.

¶ 72    "The purpose of impeachment is to destroy credibility." *People v. Mason*, 324 Ill. App. 3d 762, 766 (2001); see also *People v. Redd*, 135 Ill. 2d 252, 302 (1990). Generally, impeaching evidence suggests that the witness has something to gain or lose from his testimony. *People v. Coleman*, 206 Ill. 2d 261, 278 (2002); *People v. Williams*, 2011 IL App (1st) 093350, ¶ 33. An accused in a criminal case, by taking the stand in his or her own defense, becomes a witness and is subject to impeachment as to his or credibility, although their character otherwise is not placed in issue.  M. Graham, Cleary & Graham's Handbook of Illinois Evidence, § 607.1 (9th ed. 2009). In that regard, caselaw is replete with incidents of defendant's being impeached based on prior inconsistent statements. Even so, impeachment of a witness is restricted to relevant matter; a witness may not be impeached on collateral or irrelevant matters. *People v. Santos*, 211 Ill. 2d 395, 407 (2004) (quoting *People v. Sandoval*, 135 Ill. 2d 159, 181 (1990)).

¶ 73 "A matter is collateral if it is not relevant to a material issue of the case." *Santos*, 211 Ill. 2d at 405 (quoting *Esser v. McIntyre*, 169 Ill. 2d 292, 304-05 (1996)). Relevant evidence means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M. Graham, Cleary & Graham's Handbook of Illinois Evidence, § 401.1 (9th ed. 2009) (citing cases). Evidence that is not relevant is not admissible. *Id.* Further, even if relevant, where the proffered evidence lacks sufficient probative value when considered in light of the danger of unfair prejudice, the likelihood of confusion of the issues, misleading the jury and presentation of cumulative evidence, it will not be admitted. See *People v. Illigen*, 145 Ill. 2d 353, 365 (1991).

¶ 74 Here, evidence of defendant's civil suit, filed subsequent to the occurrence of the alleged criminal offense, was offered to attack her credibility. The inference to be drawn was that, but for the opportunity to be awarded money damages in a civil suit, defendant would testify truthfully in her criminal trial, meaning that she would otherwise admit guilt to the offense. I rather believe that a defendant, guilty as charged, would be motivated to testify falsely to secure an acquittal. This was not an impeachment by a prior inconsistent statement, where the defendant made statements regarding the offense that differed from her testimony thus, cancelling out the trial testimony. See *People v. Cruz*, 162 Ill. 2d 314 (1994). Neither was it other crimes impeachment, offered to show intent, identity, modus operandi, motive, absence of mistake and material fact other than propensity that is relevant to the case. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). In both those circumstances, the impeachment evidence is related to some allegedly improper conduct by the defendant, which preceded commencement of the criminal trial, and was relevant to the issue of guilt for the charged offense.

¶ 75     The civil suit evidence was of a different caliber than prior inconsistent statements or other crimes evidence. Evidence of defendant's civil suit, filed subsequent to the alleged criminal offense and which was clearly not improper conduct, was presented by the State to infer defendant's motive to fabricate her innocence. It was tantamount to telling the jury that but for the opportunity to receive civil damages, the defendant would tell the truth about the offense, thereby defeating the presumption of innocence on a basis other than proof of the elements of the offense beyond a reasonable doubt. The presumption of innocence in a criminal case is a "rather forceful way of saying that the prosecution must prove guilt beyond a reasonable doubt and that there is to be no inference against the defendant because of his arrest, indictment, or presence as a defendant in court." M. Graham, Cleary and Graham's Handbook of Illinois Evidence, § 304.2 (9th ed. 2009).

¶ 76     The State devotes its response to defendant's claimed error to distinguishing those cases relied upon by defendant. We do not disagree that the cases cited by defendant lack the requisite legal analysis to be of benefit. Neither the State's distinctions, nor the defendant's reliance on the cited authorities, aid in the disposition of the rather unique issue presented here.

¶ 77     In an effort to defeat defendant's analysis, the State argues that the authorities cited by defendant do not address "whether it was 'proper to admit evidence of a pending federal Section 1983 lawsuit against a criminal defendant in his criminal trial.' " I would note that not only does defendant not cite to any cases addressing that issue, neither does the State.  In fact, the State cites only *Davis*, for the general proposition that "a *defendant* has the right to inquire into *a witness'* bias, interest or motive to testify falsely." (Emphasis added.) *People v. Davis*, 185 Ill. 2d 317, 337 (1998). Notably, no case is cited, either by the State or by defendant, for the proposition that the *State* has the right to inquire into a *criminal defendant's* bias, interest or motive to testify falsely by offering evidence of a defendant's filed civil lawsuit. And, indeed, there is a difference.

¶ 78     The majority overlooks that difference and cites *People v. Martinez*, 120 Ill. App. 3d 305 (1983) and *People v. Crosser*, 117 Ill. App. 3d 24 (1983) as support. In *Martinez*, this court held that the trial court's preclusion of the defendant's cross-examination of the accident victim as to whether he contemplated filing a civil suit, for the purpose of showing the victim's bias, was proper because the civil suit had not yet been filed. 120 Ill. App. 3d at 308. Notably, this case involves a defendant seeking to impeach a witness for bias, as opposed to the State seeking to impeach a criminal defendant based on bias. Similarly, in *Crosser*, the court held that the defendant's attempt to elicit evidence that the victim filed a civil suit, seeking money damages for injuries sustained at the defendant's hands was appropriate to show bias. 117 Ill. App. 3d at 29. Again, this case involves a criminal defendant seeking to impeach a witness based on bias, as opposed to the State seeking to impeach a criminal defendant based on bias.  There is no shortage of cases similar to *Martinez* and *Crosser* in which a defendant seeks to show witness bias. The converse cannot be said, and I believe for good reason.

¶ 79     Research of the specific issue presented in this case, whether the State may present evidence of the defendant's filing of a civil suit to show bias or a motivation to testify falsely in his criminal trial has yielded only one case. Although out of state and not entirely on point, *State v. Powell*, 93 Conn. App. 592, 593 (2006), offers a perspective on the issue. Further, although the State's conduct in the case at bar is not nearly as pervasive as that of the prosecution's in *Powell*, similar concerns expressed, particularly by the dissent in *Powell,* prevail here.

¶ 80     In *Powell*, the defendant claimed error in the trial court's admission of evidence regarding a civil lawsuit brought by the defendant against the city of Stamford and the police officers who arrested him. 93 Conn. App. at 598. At trial, on cross-examination of the arresting officer, the defendant inquired of the officer concerning statements made in his deposition testimony in the

civil action. *Id.* at 595. On redirect, the State posed questions to the officer on the issue and further, throughout the course of trial referred to the defendant's "million-dollar lawsuit." *Id.* at 595-98. On appeal, the defendant claimed reversible error in the court's admission of the State's evidence and continued reference to the civil suit. *Id.* at 598. The prosecution argued that defendant had "opened the door for the admission" of that testimony by introducing the officer's civil deposition testimony during defendant's cross-examination of the officer. *Id.* The court noted that "[e]ven though the [State's] rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence." *Id.* at 600. The court, in rejecting the defendant's claim of error stated that because the defendant had introduced evidence concerning the civil trial deposition, the trial court did not abuse its discretion by permitting the State to question the officer regarding the context of that deposition. *Id.* at 600.

¶ 81    The dissent disagreed strongly with the majority's conclusion that the admission of the civil trial evidence was proper under the "opening the door" doctrine. *Id.* at 609. Significantly, the dissent argued that the testimony regarding the defendant's civil case, permitted to be elicited on redirect examination, was highly prejudicial to the defendant. *Id.* at 614-15. The dissent noted that the connotation sometimes is that such individuals are motivated solely by money. *Id.* at 615. "That evidence unfairly took the jury's attention away from the facts of the criminal case and emphasized a controversial lawsuit that carried negative connotations about the criminal defendant. *Id.* at 616. The dissent noted that evidence of the defendant's civil lawsuit prejudiced the defendant by distracting the jury from the criminal case and appealing to the common prejudice against individuals who sue the government for large sums of money. *Id.* at 617.

¶ 82    The significance of *Powell* here is not the court's resolution on the invited error issue, but rather its recognition that evidence of the defendant's civil lawsuit was inadmissible. Even though a criminal defendant who elects to testify becomes a witness in a case, there is a distinct difference between him and other witnesses, which necessarily inform evidentiary rulings. That distinction is honored in instances where the State seeks to introduce evidence of a defendant's other crimes. Unlike other witnesses, a criminal defendant, regardless of his status as a witness, is entitled to the presumption of innocence. For that reason, other crimes evidence, even if admissible, may be excluded if unduly prejudicial, and importantly, the State's burden of proof is not lessened even if a guilty defendant might lie to secure his acquittal. I believe that the evidence of defendant's civil case, offered to show defendant's bias or motive to testify untruthfully, was improper impeachment. Further, to find such evidence permissible will have a chilling effect on a defendant's right to file a civil suit as to do so risks compromising, not only the presumption of innocence, but the decision to testify in his or her own defense.

¶ 83    A defendant is entitled to have his or her guilt or innocence evaluated solely on the basis of the crime charged. *Donoho*, 204 Ill. 2d at 170 (citing *People v. Lampkin,* 98 Ill. 2d 418, 430 (1983)). Even where evidence is otherwise admissible, a trial court can exclude that evidence where the probative value is substantially outweighed by the danger of unfair prejudice to the defendant. *Id*. Even so, the initial inquiry for the admissibility of all evidence is its relevance.

¶ 84    Here, defendant was charged with aggravated battery of a peace officer. To prove guilt of the offense, the State had to prove a battery by defendant and knowledge that the battery was to a peace officer. See 720 ILCS 5/12-3.04(d)(4) (West 2014). The fact of defendant's civil suit, filed subsequent to occurrence of the charged event, had no tendency to prove any element of the offense and thus was not relevant on any issue of defendant's guilt. To the extent that the evidence

distracted the jury's focus on the relevant issue in the case, proof of aggravated battery of a peace officer, or prompted a decision on an improper basis, the perception that defendant stands to benefit financially by maintaining his innocence, its admission was prejudicial.

¶ 85     That said, in light of the relevant evidence of defendant's guilt, I believe the error, though prejudicial, was harmless.